Kathryn RODRIGUEZ, Respondent,

v.

SUZUKI MOTOR CORPORATION,
et al., Appellants,

Deborah Dubis, Respondent.

No. 80667.

Supreme Court of Missouri,
En Banc.

June 1, 1999.

Rehearing Denied June 29, 1999.

**50**

Robert B. Fiske, Jr., Jennifer G. Newstead, Davis, Polk & Wardwell, New York City, Frank N. Gundlach, Deirdre C. Gallager, Armstrong, Teasdale, Schlafly & Davis, St. Louis, Gene C. Schaerr, David J. Lewis, Frank R. Volpe, Nathan A. Forrester, Michael F. Wasserman, Sidley & Austin, Washington, DC, Jordan B. Cherrick, Thompson Coburn, St. Lewis, George F. Ball, Newport Beach, CA, William B. Hill, Jr., Atlanta, GA, for Appellants.

James E. Butler, Jr., Albert M. Pearson, III, George W. Fryhofer, III, Lee Tarte Wallace, Cale H. Conley, Butler, Wooten, Overby, Fryhofer, Daughtery & Sullivan, Atlanta, GA, Maurice B. Graham, The Graham Law Firm, St. Louis, John S. Wallach, Hoffman & Wallach, St. Louis, for Respondent.

Cheryl A. Callis, Kortenhof & Ely, St. Louis, for Deborah Dubis.

Charles H. Lockwood, II, Arlington, VA, David A. Fischer, John K. Hulston Hall, Columbia, Amicus Curiae Assn. of International Automobile Manufacturers, Inc.

Hugh F. Young, Jr., Executive Director, Product Liability Advisory Council, Inc., Reston, VA, Sherman Joyee, President American Tort Reform Association, Washington, DC, Thomas O. Baker, Paul S. Penticuff, Baker, Sterchi, Crowden & Rice, L.L.C., Kansas City, Evan M. Tager, Mayer, Brown & Platt, Washington, DC, Amicus Curiae Product Liability Advisory Council, Inc. & American Tort Reform Association.

Phillip D. Brady, Andrew D. Koblenz, V. Mark Slywynsky, Washington, DC, Thomas A. Sheehan, Shook, Hardy & Bacon, L.L.P., Kansas City, John A. Rogovin, John F. Niblock, Washington, DC, Amicus Curiae Automobile Manufacturers Assn.

J. Thomas Price, Mass. Bd. of Bar Overseers, Lourie & Cutler, P.C., Boston, MA, Amicus Curiae Students Against Driving Drunk.

Mark Arnold, Husch & Eppenberger, L.L.C., St. Louis, Amicus Curiae Students Against Driving Drunk & Mothers Against Drunk Driving.

Alyson C. Brown, General Counsel, Irving, TX, Amicus Curiae Mothers Against Drunk Driving.

STEPHEN N. LIMBAUGH, Jr., Judge.

This case comes before this Court for a second time and after a second trial, which, like the first, resulted in a judgment with both actual and punitive damages on plaintiff's products liability claim against Suzuki Motor Corp. (Suzuki). The case arose from a one-vehicle accident in Warren County involving a Suzuki Samurai, a sport utility vehicle (SUV), driven by co-defendant Deborah Dubis. Plaintiff, who was a passenger in the Samurai, was severely injured when it rolled over due to an alleged design defect. The judgment in the first trial was reversed for two reasons: 1) the failure to admit evidence offered by defendant Suzuki that the driver of the vehicle, codefendant Dubis, had been drinking; and 2) the failure to include in the punitive damages instruction a requirement that plaintiff must · have proved her case by "clear and convincing" evidence. *Rodriguez v. Suzuki Motor Corp.*, 936 S.W.2d 104 (Mo. banc 1996) (*Suzuki I*). Suzuki now contends that, on

retrial, the trial court erred in several other respects, including its rulings on two crucial evidentiary issues. In particular, the trial court refused to allow Suzuki to introduce a series of government reports showing that the Samurai had no design defect and refused to allow Suzuki to cross-examine one of plaintiff's expert witnesses concerning the methodology he used to determine that a design defect was present. On the basis of these claims, the judgment of the trial court is reversed, and the case is remanded for a new trial.

## I.

■ As a preliminary matter, plaintiff contests this Court's jurisdiction to hear the appeal on the ground that Suzuki's jurisdictional allegations are pretextual. Suzuki bases this Court's jurisdiction on 1) the presence of questions involving the constitutionality of statutes, and 2) the presence of questions of general interest or importance. Given the dissent's vociferous position on the jurisdictional issue, a more thorough analysis than usual is warranted.

## A.

This Court's jurisdiction of constitutional questions is controlled by article V, section 3, of the Missouri Constitution, which states, "The supreme court shall have exclusive appellate jurisdiction in all cases involving the validity of . . . a statute or provision of the constitution of this state. . . ." On the face of its jurisdictional statement,[1] as well as under the "Points Relied On" in its brief, Suzuki challenges the constitutional validity of three Missouri statutes: section 537.760, RSMo 1994 (stating the elements of a products liability claim); section 510.263, RSMo 1994 (stating the procedures for punitive damages claims); and section 537.675(2), RSMo 1994 (requiring that 50 percent of all punitive damage awards be paid to the state's tort victim's compensation fund).

■ Even though a jurisdictional allegation may be proper on its face, this Court will not entertain the appeal if the allegation is pretextual. This proposition is reflected in the repeated holdings of the court of appeals that allegations concerning the constitutional validity of Missouri statutes must be "real and substantial, not merely colorable," *AG Processing, Inc. v. South St. Joseph Indus. Sewer Dist.,* 937 S.W.2d 319, 322 (Mo.App.1996); *Kansas City Star v. Shields,* 771 S.W.2d 101, 103 (Mo.App.1989), although this Court has not used that exact language since the early 1970's, *see, e. g., Kansas City v. Douglas,* 473 S.W.2d 101 (Mo.1971). In 1976, article V, section 3 was amended to its present form, and as this Court has observed,

> Earlier constitutional language about "construction of the constitution of the United States or of this state" has been completely eliminated, and the numerous decisions about the difference between "construction" and "application" of constitutional provisions are no longer of concern. The sole question is whether the validity of the statute is involved.

*State ex rel. Union Electric Co. v. Public Service Commission,* 687 S.W.2d 162, 164 (Mo. banc 1985).

In at least one case since the 1976 amendment, this Court based its jurisdiction on the notion that the constitutional claim was brought in "good faith." *Beatty v. Metropolitan Sewer District,* 700 S.W.2d 831, 834 (Mo. banc 1985). This was no abandonment of the "not merely colorable" test, but tacitly served to clarify the somewhat confusing use of the word "color-

---

**1.** The dissent's criticism regarding Suzuki's jurisdictional statement misconstrues the record. Suzuki begins its brief with a combined introduction to the case and jurisdictional statement, with a heading that labels it as such: "Introduction and Jurisdictional Statement." Although "introductions" are not specifically provided for in this Court's rules, they are not prohibited and are sometimes helpful, and many parties on appeal include them. In fact, the dissent overlooks that plaintiff Rodriguez also included in her brief an "Introduction and Summary of Argument."

able," which has two recognized meanings: 1) "seemingly valid and genuine: having an appearance of truth, right, or justice: plausible;" and 2) "feigned, factitious, counterfeit." Webster's Third New International Dictionary 449 (1986). In the context of the "not merely colorable" test, the word "colorable" means feigned, fictitious or counterfeit, rather than plausible. In any event, this Court entertains plausible claims, which necessarily are made in good faith, but not feigned, fictitious or counterfeit claims, which necessarily are not.

■ One clear indication that a constitutional challenge is real and substantial and made in good faith is that the challenge is one of first impression with this Court. That is the reason for this Court's refusal to assume jurisdiction of cases when the precise constitutional questions raised have been settled by prior decisions of this Court, *State ex rel. Doniphan Tel. Co. v. Public Service Comm'n*, 369 S.W.2d 572, 575–76 (Mo.1963); *Swift & Co. v. Doe*, 311 S.W.2d 15, 21 (Mo.1958), and, conversely, that is the reason for the Court of Appeals' willingness to assume jurisdiction of such cases, *Connors v. Leachman*, 740 S.W.2d 376, 377 (Mo.App.1987); *Renfrow v. Gojohn*, 600 S.W.2d 77, 79 (Mo.App. 1980). Notwithstanding the jurisdictional importance of the fact that a constitutional claim is one of first impression, conceivably, even those claims might be so patently false and frivolous that this Court will not have jurisdiction.

A particularly apt example of a constitutional challenge that met the real and substantial and good faith test because it raised a question of first impression is this Court's recent opinion in *Riche v. Director of Revenue*, 987 S.W.2d 331(Mo. banc 1999). *Riche* was a direct appeal in which this Court based its jurisdiction on appellant's challenge to the constitutionality of section 302.505, RSMo Supp.1997, which authorizes administrative driver's license suspension and revocation for driving while intoxicated. The statute was claimed to be invalid because it failed to include a requirement for probable cause or reasonable suspicion for the initial stop of the vehicle and driver in certain instances. The underlying question was whether the exclusionary rule, which would have precluded evidence from an unlawful stop in criminal cases, applies also in administrative driver's license suspension and revocation proceedings, which are civil cases. *Id.* at 333. Despite the fact that the United States Supreme Court has never held that the exclusionary rule applies to civil cases, this Court, having never addressed the issue itself, held that jurisdiction was proper. *Id.* Moreover, jurisdiction was proper even though this Court unanimously rejected the constitutional challenge on the merits. *Id.* at 335.

■ Significantly, the fact that a constitutional challenge used to invoke this Court's jurisdiction is ultimately rejected by this Court, as in *Riche*, does not mean that the challenge was not real and substantial and brought in good faith. *See also, e.g.*, the following recent cases, in which this Court's jurisdiction was properly based on novel constitutional challenges even though the challenges were ultimately rejected on the merits, and indeed, were rejected by unanimous vote: *Missourians for Tax Justice Education Project v. Holden*, 959 S.W.2d 100 (Mo. banc 1997); *Fust v. Attorney General*, 947 S.W.2d 424 (Mo. banc 1997); *State v. Schleiermacher*, 924 S.W.2d 269 (Mo. banc 1996); *County of Jefferson v. Quiktrip Co.*, 912 S.W.2d 487 (Mo. banc 1995); *Berry v. State*, 908 S.W.2d 682 (Mo. banc 1995); *Asher v. Lombardi*, 877 S.W.2d 628 (Mo. banc 1994); *Dycus v. Cross*, 869 S.W.2d 745 (Mo. banc 1994); *Easter v. Ochs*, 837 S.W.2d 516 (Mo. banc 1992).

With these considerations in mind, this Court concludes that the challenge to section 537.675 is real and substantial and was brought in good faith, and as such, it provides a proper basis for this Court's jurisdiction without need to address the other constitutional challenges. This Court has never passed on the exact issue regarding

section 537.675: whether the payment of one-half of punitive damage awards into the state fund for tort victims' compensation is a violation of the Excessive Fines Clause, or a violation, at least from the defendant's perspective, of the Takings Clause. Plaintiff's claim that these issues were settled in *Fust v. Attorney General,* 947 S.W.2d 424 (Mo. banc 1997), is misplaced. In *Fust,* this Court addressed the Takings Clause only as it applied between the state and the plaintiff who won the punitive damage award. However, *Fust* did not address the Takings Clause from the standpoint of the defendant who pays the award, nor was the *Fust* Court even presented with the issue concerning the Excessive Fines Clause. Those issues remain unadjudicated. *See Benjamin F. Evans, Note, "Split–Recovery" Survives: The Missouri Supreme Court Upholds the State's Power to Collect One–Half of Punitive Damage Awards* 63 Mo.L.Rev. 511, 525–26 (1998). Furthermore, although there are few states that have "split recovery" punitive damages statutes like section 537.675, *id.* at 512, at least one case from those other jurisdictions has held that the statute in question did violate the Excessive Fines Clause. *McBride v. General Motors Corp.,* 737 F.Supp. 1563, 1578–79 (M.D.Ga.1990).

The dissent's emphasis on Suzuki's alleged lack of standing to raise the constitutional claim misses the mark. Borrowing from well-established United States Supreme Court precedent, this Court has held that the party asserting standing must allege "such a personal stake in the outcome of the controversy" as to warrant invocation of this Court's jurisdiction and to justify exercise of the court's remedial powers on the party's behalf. *Harrison v. Monroe County,* 716 S.W.2d 263, 266 (Mo. banc 1986) (internal citations omitted). This "personal stake," in turn, generally depends on whether the party can allege "some threatened or actual injury resulting from the putatively illegal action." *Id.*

■ In this case, Suzuki has a "personal stake" in the resolution of the constitutional claim because judgment was entered against Suzuki in accordance with and as a result of the putatively illegal requirement of section 537.675 that 50 percent of the judgment awarding punitive damages is "deemed rendered in favor of the state of Missouri." This is sufficient to confer standing to raise the constitutional challenge to section 537.675. Although it may well be true, as the dissent suggests, that Suzuki would have to pay the entire punitive damage award to plaintiff even if the statute is declared unconstitutional, and in that sense Suzuki would not be aggrieved, the fact remains that under the statute as it now exists, Suzuki would still suffer "the actual injury" of having to pay 50 percent of the punitive damages award to the state. Moreover, the underlying premise that Suzuki would have to pay the full amount of the punitive damages judgment is merely an assumption that is open to question and that has not been litigated. It is arguable, for instance, that the 50 percent of the award in favor of the state simply lapses in light of the public policy behind the statute that plaintiffs should not receive the windfall of full punitive damage awards. In any case, the fact that the full punitive damages award might lawfully be imposed in favor of plaintiff does not mean that Suzuki lacks the standing to allege that a portion of the punitive damages award was unlawfully imposed in favor of the state.

■ Although the issues concerning the constitutionality of section 537.675 are sufficient to invoke this Court's jurisdiction, it is unnecessary to address the merits of those issues. This Court, following a long line of cases, generally declines to rule on constitutional issues that are not essential to the disposition of the case, and retains jurisdiction nonetheless, where, as here, there is reversible error as to other issues. *See, e.g., State ex rel. Director of Revenue v. Gabbert,* 925 S.W.2d 838, 839 (Mo. banc 1996); *Farm Bureau Town and Country*

*Ins. Co. of Missouri v. Angoff,* 909 S.W.2d 348, 353 (Mo. banc 1995); *State ex rel. Williams v. Marsh,* 626 S.W.2d 223, 227 (Mo. banc 1982); *State v. Wilkinson,* 606 S.W.2d 632, 635 (Mo. banc 1980).

## B.

An alternative and independent ground for this Court's jurisdiction, is article V, section 10, of the Missouri Constitution, which allows this Court to transfer a case from the Court of Appeals before or after opinion "because of the general interest or importance of a question involved in the case." In recent years, this Court has invoked the jurisdictional ground of "general interest or importance" to retain jurisdiction of cases that had been improperly transferred to this Court under faulty jurisdictional claims. *See Adams Ford Belton, Inc. v. Missouri Motor Vehicle Com'n,* 946 S.W.2d 199, 201 (Mo. banc 1997); *Kuyper v. Stone County Com'n,* 838 S.W.2d 436, 439 (Mo. banc 1992). Even if jurisdiction in this case could not be based on Suzuki's constitutional challenge, jurisdiction is warranted by the presence of several questions of "general interest or importance," which are addressed extensively in this opinion.

## II.

The circumstances of the accident, as set out in *Suzuki I,* and as recapitulated in the second trial, are as follows:

On February 11, 1990, defendant Deborah Dubis was driving a Suzuki Samurai on Highway 94, with plaintiff Rodriguez and Lisa Nunnally as passengers. The vehicle left the right side of the roadway, traveled into the ditch, and struck a 14–inch–high dirt headwall—the side of a cemetery driveway. What happened next was hotly disputed. According to the driver and passengers, the Samurai returned to the roadway, crossed the center line, and when Dubis turned sharply right to correct, the vehicle rolled over. According to Suzuki, the Samurai never returned to the road-

way. Instead, the impact with the cemetery driveway launched the vehicle into the air, causing the Samurai to roll in the ditch.

*Id.* at 106.

The trial court instructed on plaintiff's claims of strict products liability, negligence, and punitive damages against Suzuki, on plaintiff's negligence claim against Dubis, and on a cross-claim Suzuki brought against Dubis. In its verdict for plaintiff, the jury set compensatory damages at $25 million, assessing fault at 99.85% to Suzuki, 0.15% to Dubis, and 0% to plaintiff. The jury also awarded punitive damages in the amount of $11.9 million. On motion for remittitur, the trial court reduced the award of compensatory damages to $20 million.

The thrust of plaintiff's case was to establish that the accident was caused by a design defect that gave the Samurai a propensity to roll over in emergency driving situations like that encountered by plaintiff and her companions. As such, plaintiff was required to prove, *inter alia,* that the roll over propensity made the Samurai "unreasonably dangerous when put to a reasonably anticipated use" under the products liability theory, MAI 5th 25.04, and not "reasonably safe," under the negligence theory, MAI 5th 25.09. To meet that proof, plaintiff relied principally on a 1988 study conducted by Consumers Union and published in its magazine, Consumer Reports, and the testimony of two expert witnesses, both of whom were engineers who had personally tested the Samurai's roll over problem as part of studies made by independent companies under government contracts. The substantial evidence from these sources and others showed, in the most basic lay terms, that the Samurai had a center of gravity that was too high and was supported by a "track" (the wheel-to-wheel width along the axles) that was too narrow, thus causing it to overturn under certain "ordinary emergency steering maneuvers." According to the Consumers Union report and

the experts, the Samurai had the lowest (worst) "rollover safety margin" of any SUV tested.

In response to plaintiff's design defect evidence, Suzuki called its own expert witness who disputed the opinions made by Consumers Union and plaintiff's experts, as well as the methodology on which the conclusions were based. However, on hearsay grounds, the trial court disallowed the introduction of official reports from the United States and British governments that also contradicted plaintiff's evidence. Those reports, which ironically consisted of the results of investigations instigated by recall petitions from consumer groups, were published by the National Highway Transportation Safety Administration (NHTSA) in 1988, 1996, and 1997, and by the Transport and Road Research Laboratory (TRRL), an agency of the Great Britain Department of Transportation, in 1988. All the reports dealt directly with the Samurai's alleged roll over problem except the 1997 report, which involved two other SUVs, the Isuzu Trooper and the Acura SLX, but even that report focused on the validity of the roll over testing methodology that Consumers Union and plaintiff's experts used to test the Samurai. That testing methodology—called the "modified accident avoidance maneuver," or "CU2 maneuver"—was criticized in all the reports. According to the 1998 NHTSA report, the test did "not have a scientific basis and cannot be linked to real-world crash avoidance needs, or actual crash data." Additionally, the NHTSA found that the Samurai's "static stability ratio"—the ratio of the half track width of the vehicle to center of gravity height—was well within the range for vehicles of its type, and further, that the Samurai's real-world performance on the nation's highways was comparable to that of most SUVs. It is noteworthy that the report also concluded that "[r]ollovers ... often appear to have been influenced by adverse

driver and environmental factors such as high risk driving maneuvers, drinking, low ambient light, and lack of driver familiarity with either the vehicle or the road." Conclusions to the same effect were set out in the 1988 TRRL and 1996 NHTSA reports that were prepared after additional investigations, and the 1997 NHTSA report reiterated the point that the Consumers Union testing methodology was invalid.

### A.

■ There is no question that the government reports are highly relevant, but they are also hearsay. Suzuki claims the official records exception to the hearsay rule (sometimes called the public records exception) allows their admission, while plaintiff contends, and the trial court agreed, that the exception does not apply to opinions and conclusions contained within those records. Missouri has no statutory hearsay exception that encompasses public records in general, but a specific exception has been codified in section 490.220, RSMo 1994, for official records of the United States and sister states. That section states:

> All records and exemplifications of office books, kept in any public office of the United States, or of a sister state, not appertaining to a court, shall be evidence in this state, if attested by the keeper of said record or books, and the seal of his office, if there be a seal.

As this Court has observed, section 490.220 is one of a number of statutes that eliminate the foundational requirements of authentication, best evidence, and hearsay for the admission of certain public documents. *Hadlock v. Director of Revenue*, 860 S.W.2d 335, 337 (Mo. banc 1993). Referring to section 490.220, in particular, this Court then concluded that "[s]o long as the requirements of the statute are met and the records are relevant, they are admissible." *Id.*[2]

2. The dissent's suggestion that section 490.220 is nothing more than an authentica-

tion statute—a point plaintiff declined to raise—is contrary to many cases holding that

The NHTSA reports, which are published in the Federal Register,[3] clearly meet the requirements of the section 490.220 exception. They are not only the records of the office books of the NHTSA,[4] but also of the Office of the Federal Register,[5] both of which entities are public offices of the United States. The second requirement of the statute—that the reports be authenticated by the seal of the government agency in question—is satisfied by the fact that the Federal Register is published under seal of the National Archives and Records Administration, which authenticates the Federal Register as the official serial publication established under the Federal Register Act. See 44 U.S.C. secs. 1501 et seq. (1994); 1 C.F.R. sec. 2.3 (1998).

Although there appears to be no case addressing the precise question here presented—whether the statutory exception encompasses opinions and conclusions contained within the records—the statute is unqualified and open-ended. Once the statutory foundational requirements are met, and plaintiff makes no contention that they were not met in this case, then the reports are admissible in their entirety. As such, the trial court erred in excluding them.

Plaintiff does not discuss section 490.220 in her brief and relies instead on two treatises, *Missouri Law on Evidence* and *Missouri Evidence Restated*, that distinguish between reports containing facts,

which are admissible, and reports containing opinions or conclusions, which are not. *Mo. Law on Evidence* (3d ed.), sec. 11–23, at 398; *Mo. Evidence Restated*, sec. 803(8) (MoBar 3d ed.1996). Inexplicably, the treatises focus on the exception as if it were based strictly on the common law, and they cite neither section 490.220 nor any other of the other dozens of statutes that codify the exception on an ad hoc basis as it pertains to specific kinds of public records. *See, e.g.*, sec. 339.130, RSMo 1994 ("[c]opies of records and proceedings of the [Missouri real estate] commission, and of all papers on file in its office ..."); sec. 386.290, RSMo 1994 ("[c]opies of all official documents and orders filed or deposited according to law in the office of the [public service] commission, certified by a commissioner ..."); sec. 490.180, RSMo 1994 ("[c]opies of all papers on file in the office of the secretary of state, state treasurer, state auditor, and register of lands ..."); sec. 490.580, RSMo 1994 ("[t]he record books of marriages to be kept by the respective recorders ..."). For a comprehensive list of Missouri statutes see 23 Mo. Practice section 803(8).1, n.4 (1992).

It is enough concern, perhaps, that neither plaintiff nor the authorities she cited paid any heed to the special statute for United States government records, but it bears mention as well that the principal case on which the treatises rely— *Kansas City Stock Yards Co. v. A. Reich & Sons,*

---

that section also authorizes the admission of hearsay documents. Cases from recent years, in addition to *Hadlock*, include *State v. McMillin*, 783 S.W.2d 82, 95 (Mo. banc 1990); *Hefele v. National Super Markets, Inc.*, 748 S.W.2d 800, 803 (Mo.App.1988); *United States v. Estate of Weidemann*, 708 S.W.2d 735, 737 (Mo.App.1986); and *Kastner v. Beech Aircraft Corp.*, 650 S.W.2d 312, 318–19 (Mo.App.1983).

3. The Federal Register is published by the Office of the Federal Register, National Archives and Records Administration under the Federal Register Act, 44 U.S.C. secs. 1501 et seq. (1994).

4. The NHTSA, when presented with a defect petition, is required by statute and regulation to conduct a technical review of the petition. 49 C.F.R. sec. 552.6 (1997). Once it decides not to grant a recall petition, NHTSA is required to issue a notice of denial, published in the Federal Register, within 45 days, setting forth its reasons. 49 C.F.R. sec. 552.10 (1997).

5. "The original and two duplicate originals or certified copies of a document required or authorized to be published by section 1505 of this title shall be filed with the Office of the Federal Register ...." 44 U.S.C. sec. 1503 (1994).

250 S.W.2d 692 (Mo.1952)—is hardly solid authority. In that case, this Court affirmed the trial court's exclusion of a fire investigation report prepared by officials of the Kansas City fire department for the reason that a critical notation in the report "was a conclusion based upon hearsay twice removed" and that "[i]t was an opinion upon the very question that jury was to decide...." *Id.* at 700. Although the Court then acknowledged that there was an "exception to the hearsay rule admitting official reports made by an officer on the basis of his own personal investigation and knowledge," the Court then distinguished the case at hand by holding "in so far as documents set forth mere opinions or conclusions of public officials, they are inadmissible as official records or documents, ...." *Id.* (citing 32 C.J.S., Evidence, sec. 637, page 490).

*Kansas City Stock Yards* appears to be solely an exposition of the common law exception and does not purport to address United States government reports nor, for that matter, any other reports covered under statutory exceptions. Aside from that, however, the Court's exclusive reliance on C.J.S. is also suspect. The key passage cited from C.J.S. omits the very next line that significantly qualifies the proposition. The complete sentence states,

> In so far as documents set forth the mere opinions or conclusions of public officials, they are inadmissible as official records or documents, at least where the official would not be competent to testify as to such opinion or conclusion, or where the opinion or conclusion is of doubtful reliability in the absence of the right of cross-examination....

32 C.J.S., Evidence, sec. 637.[6] Given a fair reading, C.J.S. suggests that conclusions and opinions are admissible under the common law public records exception, at least in certain situations, but *Kansas City Stock Yards* took only the narrowest reading possible. That said, this Court leaves

for another day the question of the proper scope of the common law public records exception, as the records in this case were admissible under section 490.220 regardless.

Finally, this Court disagrees with plaintiff's policy suggestion that the admission of such "unbridled rank hearsay" is a grave mistake. In the first place, this Court has no choice in the matter because, as stated, admission of the reports is required by statute. In addition, under Rule 803(8)(c) of the Federal Rules of Evidence, United States government reports, conclusions and all, are routinely admitted for plaintiffs and defendants alike. *See, e. g., Beech Aircraft Corp. v. Rainey,* 488 U.S. 153, 161–70, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988), *In re Korean Air Lines Disaster of Sept. 1, 1983,* 932 F.2d 1475, 1481–83 (D.C.Cir.1991); *Federal Aviation Admin. v. Landy,* 705 F.2d 624, 632–33 (2d Cir. 1983); *Robbins v. Whelan,* 653 F.2d 47, 50–52 (1ˢᵗ Cir.1981); *In re Multi–Piece Rims Products Liability Litigation,* 545 F.Supp. 149, 150–52 (W.D.Mo.1982). *See also* Michael A. DiSabatino, Annotation, *Admissibility, Under Rule 803(8)(c) of Federal Rules of Evidence, of "Factual Findings Resulting From Investigation Made Pursuant to Authority Granted by Law."* 47 A.L.R. Fed. 321 (1980). Moreover, the majority of other jurisdictions have followed suit with the adoption of similar rules. 5 Wigmore, Evidence sec. 1633a (Chadbourn rev. 1974 & Supp. 1998). As the Supreme Court has observed, there should be little concern over conclusions contained in such reports because they are "subject to the ultimate safeguard—the opponent's right to present evidence tending to contradict or diminish the weight of those conclusions." *Beech Aircraft Corp. v. Rainey,* 488 U.S. at 168, 109 S.Ct. 439.

■ Having determined that the NHTSA reports should have been admit-

---

6. Current editions of C.J.S. omit the discussion on opinions and conclusions, and the entire subject of the public records exception is reconfigured in 32A C.J.S. sec. 834 et seq.

ted, it is necessary to address whether their exclusion was prejudicial. Certainly, the reports go to the heart of plaintiff's case—the existence of a roll over design defect—and this reason alone may justify reversal. *Smith v. Wal–Mart Stores, Inc.,* 967 S.W.2d 198, 207 (Mo.App.1998) (*citing Kummer v. Cruz,* 752 S.W.2d 801, 808 (Mo.App.1988)). Additionally, the fact that the reports were generated by a government entity that is presumably independent and unbiased and whose ultimate function is to protect the public by seeking out product defects, if they exist, gave the reports great credibility. *Kastner v. Beech Aircraft Corp.,* 650 S.W.2d at 319. Indeed, that great credibility is the very reason behind the common-law hearsay exception for such reports. *Id.* It should be added that the reports were all the more important because Suzuki's own design defect expert was paid a handsome fee for testifying, and his credibility was thus subject to question, a point that plaintiff's counsel ably drove home to the jury. Finally, for all the above reasons, plaintiff's argument that the exclusion of the reports was not prejudicial because they were merely cumulative to the testimony of Suzuki's expert is unpersuasive.

Plaintiff also maintains that no prejudice occurred because 1) Suzuki's expert (in apparent contravention of the trial court's ruling) testified that no government had accepted the CU2 maneuver as an indication of roll over propensity; and 2) Suzuki was allowed to introduce and argue the "fact" [7] that no recall had been ordered as a result of any of the NHTSA investigations. This limited evidence concerning the NHTSA decisions, however, does not touch on the reasons and analysis on which they were based. Without that information, plaintiff was allowed to discount the decisions as speculative or immaterial. Furthermore, the door was opened for accusations plaintiff made throughout the trial that the NHTSA decisions were based not on scientific analysis, but on political pressure from Suzuki.

Under these circumstances, this Court concludes that the failure to admit the NHTSA reports was unduly prejudicial. Mindful of the fact that, absent settlement, this ruling will result in a third trial, the result is nonetheless consistent with the many cases holding that a new trial is mandated where a party was prejudiced by the improper exclusion of evidence. *See, e.g., Washington by Washington v. Barnes Hosp.,* 897 S.W.2d 611 (Mo. banc 1995) (exclusion of evidence of free public school programming available to injured minor child on question of mitigation of damages in medical malpractice case); *Shoemake v. Murphy,* 445 S.W.2d 332 (Mo. 1969) (exclusion of landowner's offers to convey land for certain price in condemnation action); *Felton v. Hulser,* 957 S.W.2d 394 (Mo.App.1997) (exclusion of admissions made in response to discovery requests by defendant); *Sigrist v. Clarke,* 935 S.W.2d 350 (Mo.App.1996) (exclusion of portions of hospital records in malpractice action); *State ex rel. Missouri Highway and Transp. Comm'n v. Beseda,* 892 S.W.2d 740 (Mo.App.1994) (exclusion of landowner's testimony and photographs relating to 20 ft. wide paved entrance in condemna-

7. The plaintiff's and trial court's characterization of the NHTSA's no recall decision as a "fact" appears to be a strained effort to distinguish between "facts" that might be admissible under the common law official records exception, and opinions and conclusions that purportedly are not. The necessary implication from the "fact" that no recall was ordered was that the NHTSA had ultimately opined and concluded that the Samurai was not defective. Thus, by calling the no recall decision a "fact," the trial court allowed into evidence the same kind of substantive evidence it excluded as opinions and conclusions. The Supreme Court in *Rainey* made the same point in explaining that "factual findings," as that term is used in Rule 8.03(8)(c), the federal government records exception, necessarily include opinions and conclusions. *Beech Aircraft v. Rainey,* 488 U.S. at 169, 109 S.Ct. 439. In any event, if the trial court had been correct that the opinions and conclusions in the NHTSA reports were inadmissible, then surely the ultimate opinion and conclusion that no recall should be ordered should have been inadmissible as well.

tion case); *Siebern v. Missouri–Illinois Tractor & Equip. Co.,* 711 S.W.2d 935 (Mo. App.1986) (exclusion of expert opinion on defective condition of coal loader in design defect case); and, of course, *Suzuki I.* Because reversal is required as to the NHTSA reports alone, this Court declines to address the application of the official records exception to the British TRRL reports, except to note that the issue is more problematic in the absence of a statute like section 490.220 and has not been fully briefed.

### B.

The original NHTSA report and even the TRRL report, both issued in 1988, were independently admissible to refute the punitive damages claim, though the scope of that admissibility was limited to Suzuki's "state of mind" in designing and marketing the Samurai.[8] During the punitive damages phase of the bifurcated trial, Suzuki offered the reports not to prove the truth of what was asserted in the reports, but instead to disprove plaintiff's allegation that Suzuki showed "complete indifference to or a conscious disregard for the safety of others." Proof of Suzuki's state of mind under the complete indifference/conscious disregard standard was the prerequisite for an award of punitive damages, MAI 5th 10.06, and therefore the information available to Suzuki concerning the safety of the Samurai as set out in the government reports was highly relevant evidence. Suzuki's knowledge of the content of the reports, in other words, bore directly on the question of Suzuki's alleged "complete indifference to a conscious disregard for the safety of others."

Because the reports were offered only for this limited purpose, there was no hearsay violation. A hearsay statement is any out-of-court statement that is used to prove the truth of the matter asserted and which depends upon the veracity of the statement for its value. *State v. Sutherland,* 939 S.W.2d 373, 376 (Mo. banc 1997). Stated another way, evidence is hearsay only if its evidentiary value depends on drawing an inference from the truth of the statement. *Id.* at 377. Furthermore, if the relevance of the statement lies in the mere fact that it was made, no reliance is placed on the truth of the statement or the credibility of the out-of-court declarant, and the statement is not hearsay. *Id.*

Although plaintiff makes no claim that the reports, at least in this limited context, were hearsay, she nonetheless maintains that the trial court committed no error in excluding them. Her twofold rationale is 1) that the reports were in fact offered for their truthfulness (that the Samurai was not defective), as opposed to Suzuki's state of mind, and 2) that the only relevance of the reports was the ultimate fact that no recall was ordered. The first point seems to be that Suzuki's offer of the reports as state of mind evidence was pretextual. However, the mere fact that evidence may be inadmissible for one purpose does not preclude its admission for an alternative legitimate purpose, *State v. Jones,* 979 S.W.2d 171, 182 (Mo. banc 1998). The evidence pertaining to Suzuki's state of mind served an alternative legitimate purpose because it was highly relevant without being hearsay. Plaintiff's recourse (had the evidence not been otherwise admissible under section 496.220) would have been to request a special instruction limiting the jury's consideration of the evidence to the sole issue of Suzuki's knowledge or state of mind. *See id.* As to the second point, the opinions and conclusions in the reports were no less relevant to Suzuki's state of mind than the ultimate "fact" that no recall was ordered. Those opinions and conclusions, as noted, formed the basis for the decision not to order a recall. For

---

8. Suzuki apparently did not seek the admission of the 1996 and 1997 reports under this argument, presumably because production of

the Samurai was discontinued before issuance of those reports, and their relevance would have been marginal.

these reasons, plaintiff's points supporting the exclusion of the records have no merit.

## III.

■■ The second evidentiary issue involves the scope of cross-examination permitted of one of plaintiff's design defect experts, Dr. Andrzej G. Nalecz. Dr. Nalecz, a former university professor, devised a computer simulation, known as the "Advanced Dynamics Vehicle Simulation" or "ADVS," that plaintiff introduced at trial and that purported to reconstruct plaintiff's version of the sequence of events at the scene of the accident. This was done to illustrate that the Samurai was unstable and would indeed roll over under those particular emergency conditions. In addition, plaintiff introduced a second Nalecz-designed ADVS featuring a different SUV, a Jeep Wrangler, that, when put to the same conditions, did not roll over.

The dispute arose when counsel for Suzuki attempted to confront Dr. Nalecz on cross-examination with a 1992 memorandum he had written to his then department chair. The memorandum stated that the ADVS device was "practically unusable for investigating the handling behavior and stability of modern vehicles which utilize the latest technologies. . . ." In a second memorandum from 1993, Dr. Nalecz agreed that his ADVS had been discredited in other studies and concluded that "the ADVS is practically worthless since no one can make effective use of the simulation." The trial court sustained plaintiff's objection to this line of questioning and the introduction of the memorandums on the ground that the ADVS used to evaluate the accident had been modified to eliminate the problems. Moreover, the trial court refused to allow Suzuki's counsel to confront Dr. Nalecz with evidence that the new ADVS still contained virtually all the deficiencies identified in the earlier studies, despite the fact—submitted by way of offer of proof—that Dr. Nalecz appears to have conceded as much in a deposition given before trial.

■■ Whether Dr. Nalecz's post hoc explanation for his critique of the ADVS was right or wrong, Suzuki should have been allowed to cross-examine him about the matter. To be sure, "the extent and scope of cross-examination in a civil action is within the discretion of the trial court," and the trial court's discretion on such matters "will not be disturbed unless an abuse of discretion is clearly shown." *Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852, 869 (Mo. banc 1993) (quoting *Stafford v. Lyon*, 413 S.W.2d 495, 498 (Mo. 1967)). However, in the exercise of that discretion in situations involving the cross-examination of expert witnesses, parties are to be given wide latitude "to test qualifications, credibility, skill or knowledge, and value and accuracy of opinion." *Id.* In this case, it was an abuse of discretion to limit the cross-examination of Dr. Nalecz. The error committed in this instance compounds the error in disallowing the government reports and reconfirms the earlier conclusion that reversal is required.

## IV.

In view of the disposition of the case on the foregoing issues, this Court would usually decline to address other issues raised. *See, e.g., Suburban Newspapers of Greater St. Louis, Inc. v. Director of Revenue*, 975 S.W.2d 107, 110 (Mo. banc 1998); *State v. Mayo*, 915 S.W.2d 758, 759 (Mo. banc 1996). However, given the need for a third trial, and in recognition of the substantial litigation expenses that will be borne by all of the parties, a review of the two issues to which the parties have devoted most of their attention (other than the government records issue) is not inappropriate. Those issues are 1) whether the physician-patient privilege precludes the discovery of any blood alcohol tests taken of defendant Dubis in the hospital emergency room, and 2) whether this Court should incorporate the Restatement (Third) of Torts "risk-utility" test in the verdict directing instruction submitted in design defect cases.

The issue concerning blood alcohol evidence arose in this way: Pending retrial, and in light of the holding from the first appeal that evidence of codefendant Dubis' alcohol consumption was admissible on the issue of her own negligence, *Suzuki I* at 105, Suzuki repeatedly sought discovery of the results of any blood alcohol tests taken of Dubis at St. John's Mercy Hospital, the hospital where she and the other injured parties were taken immediately after the accident. Claiming physician-patient privilege under section 491.060(5), RSMo 1994, Dubis moved to quash the various discovery requests, and each time, the trial court sustained the motions. Suzuki's petition for writ of prohibition and/or mandamus, filed first in the Court of Appeals and then in this Court, were both denied, in turn.

At trial, the question of Dubis' alcohol consumption and the effect it had on her driving ability was hotly contested. By her own admission, Dubis drank at least three "sampler" glasses and two full-sized glasses of wine while visiting wineries shortly before the accident. This consumption, alone, according to a toxicologist called by Suzuki, would have yielded a blood alcohol content of 0.07% at the time of the accident. Nonetheless, Dubis' counsel was very effective in cross-examining the toxicologist and in introducing evidence tending to dilute the proof of Dubis' impairment. Undoubtedly, the result of blood alcohol tests would have been the strongest proof of Dubis' impairment, or lack thereof. In any event, when faced with alcohol impairment evidence that was both conflicting and uncertain, the jury apportioned only 0.15% fault against Dubis.

### A.

■ On appeal, Suzuki contends that the trial court committed error in quashing its discovery requests for any blood alcohol tests. Plaintiff responds, as a preliminary matter, that the law of the case was fixed when the Court of Appeals, and later this Court, denied the petition for writ of prohibition on the discovery issue; therefore, the discovery issue is no longer reviewable. To the contrary, plaintiff's position does not comport with the law of the case doctrine, which provides, in general, that a previous holding in a case constitutes the law of the case and precludes relitigation of that issue on remand and subsequent appeal. *Kansas City v. Keene Corp.*, 855 S.W.2d 360, 366 (Mo. banc 1993). However, the doctrine is limited to cases in which the issue in controversy has been raised and decided in a prior appeal. *Boillot v. Conyer*, 861 S.W.2d 152, 154 (Mo.App.1993); *Davis v. J.C. Nichols Co.*, 761 S.W.2d 735, 741 (Mo. App.1988). The mere denial of a petition for writ of prohibition where the appellate court issues no opinion is not a conclusive decision on the merits of the issue presented. *Augspurger v. MFA Oil Co.*, 940 S.W.2d 934, 937 (Mo.App.1997); *State ex rel. Pain, Anesthesia and Critical Care Services, P.A. v. Ryan*, 728 S.W.2d 598, 601–02 (Mo.App.1987). Indeed, there are a number of reasons why the appellate court might decline to review a writ petition on the merits, not the least of which is the probability that the issue presented can be adequately reviewed, as here, on direct appeal after the facts pertaining to the issue are fleshed out more thoroughly at trial. *See* Rule 84.22. In sum, the law of the case doctrine has no application to the privilege issue now presented.

The merits of the privilege issue are controlled by section 491.060, RSMo 1994, which states in pertinent part:

> The following persons shall be incompetent to testify: ... (5) A physician licensed under chapter 334, RSMo, ... concerning any information which he may have acquired from any patient while attending him in a professional character, and which information was necessary to enable him to prescribe and provide treatment for such patient as a physician....

This subsection and others that grant testimonial privileges are to be strictly con-

strued against the privilege. *State ex rel. Health Midwest Dev. Group, Inc. v. Daugherty*, 965 S.W.2d 841, 843 (Mo. banc 1998). At first glance, and mindful of the rule of strict construction, it appears that the privilege applies only to the testimony of physicians. However, Missouri courts have repeatedly held that the privilege also extends to hospital and medical records. *State ex rel. Jones v. Syler*, 936 S.W.2d 805, 807 (Mo. banc 1997); *State ex rel. Stecher v. Dowd*, 912 S.W.2d 462, 464 (Mo. banc 1995). Under these cases, blood alcohol testing in hospital records is the kind of information that is subject to the privilege.

 To invoke the privilege, however, it must be shown that the information sought was "necessary" to the treatment of the patient. Sec. 491.060(5), RSMo 1994. Blood alcohol tests that were necessary as part of Dubis' treatment, are privileged; those that were not, are discoverable and admissible at trial. On this and all other issues concerning application of the privilege, the party seeking to invoke the privilege has the burden of proof. *State v. Henderson*, 824 S.W.2d 445, 450 (Mo.App.1991); *State v. Lewis*, 735 S.W.2d 183, 187 (Mo.App.1987) (*citing Griffith v. Continental Casualty Co.*, 253 S.W. 1043, 1047[2] (Mo. banc 1923)). In most instances, that burden may be satisfied merely by showing that the records sought were hospital records compiled, as here, by medical personnel during the course of treatment of a patient.

 Nevertheless, while those facts may well satisfy the burden of proof for most hospital records and tests, blood alcohol tests are different. As stated in an uncontested affidavit filed by Suzuki during the discovery proceedings and signed by Dr. Alan DuMontier, a board certified emergency room physician, "a large percentage of serum and/or urine ethanol [blood alcohol] levels performed in cases of vehicular trauma are not performed for purposes of treatment." To be sure, many blood alcohol tests are conducted not for purposes necessary for treatment of the patient, but for purposes of law enforcement. Due to the widespread concern about drinking and driving, the legislature has statutorily authorized blood alcohol tests to be administered at the request of law enforcement officials in connection with criminal investigations for offenses including operating a motor vehicle while intoxicated, sec. 577.020, RSMo 1994 and Supp.1998, or a watercraft, sec. 306.116.1, RSMo 1994, or an aircraft, sec. 577.206.1, RSMo 1994. Additionally, blood alcohol tests are taken for statistical purposes when a person dies as a result of a motor vehicle accident and within eight hours of the accident. *See* sec. 58.445.2, RSMo 1994 and Supp.1998; sec. 58.449, RSMo 1994. Yet another statute provides that a physician who treats a person for injuries sustained in a motor vehicle accident may report to the authorities that the person appeared intoxicated regardless of any rule of confidentiality. Sec. 334.265, RSMo 1994. Finally, given the cooperative roles that medical and law enforcement personnel play in enforcing Missouri's drunk driving laws, as illustrated by these statutes, there is also the more remote possibility that blood alcohol samples are taken in emergency rooms even without a specific request from a law enforcement officer, perhaps as a matter of routine or in anticipation of prosecutions for drunk driving. For these reasons, the burden of proof to invoke the privilege is not met by the mere assertion that blood alcohol testing was included in hospital records, as if all blood alcohol testing was necessary for treatment purposes.

 That said, however, this Court holds that Dubis met her burden of proof in this case by the introduction of uncontroverted evidence that the law enforcement officer who investigated the accident did not order a blood alcohol test.[9] In

---

9. Although an officer has the authority under section 577.020, RSMo 1994, to order a blood

view of that additional evidence, and although it is a close question, the possibility that blood alcohol testing might have been for purposes other than Dubis' treatment need not be refuted as part of her burden of proof. Testing under that scenario, even when innocently conducted, may technically constitute an assault on the patient and a breach of medical ethics, and it is not a scenario that Dubis should be required to anticipate and disprove. On the other hand, even though Dubis met her burden of proof, on remand, Suzuki should still be allowed to introduce evidence, if it exists, to establish that the testing was not for treatment purposes.

### B.

As an alternative ground for the discovery of blood alcohol testing, Suzuki contends that Dubis waived her right to claim the physician-patient privilege. Under well-established case law, the privilege is not absolute, *Brandt v. Medical Defense Associates*, 856 S.W.2d 667, 671 (Mo. banc 1993). It may be waived in a variety of ways, and the most common cases involve plaintiffs who voluntarily place their medical condition in issue by filing a petition alleging that they suffered physical or mental injuries. *State ex rel. Wilfong v. Schaeperkoetter*, 933 S.W.2d 407, 409 (Mo. banc 1996). A party may also "impliedly waive the privilege through an act showing a clear, unequivocal purpose to divulge the confidential information." *Cline v. William H. Friedman & Associates, Inc.*, 882 S.W.2d 754, 761 (Mo. App.1994); *State ex rel. Gonzenbach v. Eberwein*, 655 S.W.2d 794, 796 (Mo.App. 1983). If the privilege is waived, the opposing party may discover the medical records that reasonably relate to the physical

conditions at issue. *State ex rel. Wilfong*, 933 S.W.2d at 409.

Suzuki has not demonstrated that Dubis waived her statutory privilege under any recognized theory. She was a defendant who was sued first by Rodriguez and then by Suzuki in a cross-claim, and she brought no action for any injuries she suffered herself. Although in answer to Suzuki's cross-claim, she denied the allegation that she was intoxicated at the time of the accident, she did not plead any facts that created an issue about her medical condition. As explained in *State ex rel. Hayter v. Griffin*, 785 S.W.2d 590, 593 (Mo.App.1990), a denial of an allegation cannot constitute a waiver of the physician-patient privilege because to do so would force the patient to choose between suffering judgment by default or waiving the physician-patient privilege. Forcing that choice would be illogical and unacceptable. *Id.* Under the pleadings, at least, Dubis did not place her medical condition in issue and thus, did not waive the privilege.

Nevertheless, Suzuki claims that Dubis waived the privilege 1) when she testified in rebuttal to an offer of proof made by Suzuki (in the first trial) that when she left the winery, she did not feel lightheaded, nor was she slurring her speech or having difficulty walking, seeing or driving; 2) when she responded to questions concerning her intoxication that were posed by plaintiff's counsel on cross-examination; and 3) when her own lawyer elicited testimony from other witnesses on the intoxication issue. These claims have no merit. For the same reason that Dubis does not waive the privilege by filing an answer denying the allegations in Suzuki's cross-petition that she was intoxicated, she does not waive the privilege by introducing non-

---

alcohol test to be taken, that authority arises only when the person to be tested has been placed under arrest. However, under section 577.039, RSMo 1994, an officer is not entitled to make a warrantless arrest in a DWI case if more than one and one-half hours have elapsed from the time the claimed violation

occurred. In this case, the officer was concerned that too much time had elapsed between the time of the accident and his arrival at the emergency room; therefore, he did not arrest Dubis or have her blood alcohol level taken. Nor did he later attempt to obtain a warrant for her arrest.

medical evidence at trial. *See id.* Furthermore, the responses to questions on cross-examination that required her to divulge information about her intoxication are considered "extorted" and, therefore, involuntary. *Hemminghaus v. Ferguson,* 358 Mo. 476, 215 S.W.2d 481 (1948) overruled on other grounds by *State ex rel. McNutt v. Keet,* 432 S.W.2d 597, 602 (Mo. banc 1968); *State ex rel. Hayter v. Griffin,* 785 S.W.2d 590, 594 (Mo.App.1990). Consequently, Dubis did not waive the physician-patient privilege by testifying in the above respects.

Finally, Suzuki argues that Dubis waived her statutory privilege because, in closing arguments, her lawyer tried to persuade the jury that Suzuki was the party responsible for the absence of concrete evidence of Dubis' alleged intoxication. This argument is not supported by the record and warrants no further consideration.

### C.

Despite the clear wording of the statutory privilege, Suzuki and three groups as amici curiae, Mothers Against Drunk Driving, SADD, Inc., and American Automobile Manufacturers Association, urge this Court to allow the discovery and admission of blood alcohol evidence in all motor vehicle accident cases as a matter of policy. These parties are correct in their assertion that the privilege is always invoked at the expense of truth-seeking, and that the equities supporting the privilege are not as great in cases, as here, where a potentially culpable codefendant aligns herself with the plaintiff in order to establish that a perceived "deep-pocket" defendant was more culpable. The fact remains, however, that the privilege is set by statute, and any change to the scope of the privilege is solely a legislative prerogative.

On the record in this case, the trial court committed no error in upholding the physician-patient privilege in favor of Dubis.

### V.

Suzuki and amicus curiae, Association of International Automobile Manufacturers, Inc., argue that this Court should adopt the reasonable alternative design/risk-utility test of the Restatement (Third) of Torts as the substantive law of Missouri. Last year, this Court addressed the "risk-utility" issue in *Newman v. Ford Motor Co.,* 975 S.W.2d 147, 152–54 (Mo. banc 1998), which was handed down while this appeal was being briefed. In both *Newman* and the case at hand, counsel for defendant sought to modify the verdict director for a strict liability/defective design case, MAI 5th 25.04, so that it incorporated the so-called "risk-utility" test. Under that test, a product is defectively designed "when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller ..., and the omission of the alternative design renders the product not reasonably safe...." Restatement (Third) of Torts: Products Liability, sec. 2(b). As this Court noted in *Newman,* the risk-utility test requires a plaintiff to prove that: "(1) a reasonable, safer, alternative design was available at the time of sale; and (2) omission of the safer alternative rendered the product 'not reasonably safe.'" *Newman,* 975 S.W.2d at 152–53.

In contrast, a submission under the now-abandoned test of the Restatement (Second) required a finding that the product in question "... was in a defective condition unreasonably dangerous to the user or consumer ..." Restatement (Second) of Torts, section 402A. MAI–5th 25.04 tracks section 402A by requiring that the product was "in a defective condition unreasonably dangerous" and adds the clause "when put to a reasonably anticipated use ...", which is derived from comment h to section 402A. A glaring weakness of the section 402A approach, according to Ford in the *Newman* case, and now Suzuki, is that liability can be predicated solely on the basis of "consumer expectations," a deter-

mination that the product was "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it...." Restatement (Second) of Torts, sec. 402A, cmt. i.

This "consumer expectations" test, however, along with the "risk-utility" test, were expressly disavowed in *Nesselrode v. Executive Beechcraft, Inc.*, 707 S.W.2d 371, 377–78 (Mo. banc 1986), with the explanation that the term "unreasonably dangerous," as used in section 402A and MAI 5th 25.04, needs no judicial definition, whether derived from consumer expectations, risk-utility, or otherwise. *Id.* at 378. Instead, the concept of "unreasonable danger" is to be treated as an ultimate issue for the jury. *Id.* Under this Court's reasoning, "[a] signal virtue of such a general instruction is that it allows the jury to give the concept of unreasonable danger content 'by applying their collective intelligence and experience to the broad evidentiary spectrum of facts and circumstances presented by the parties....' " *Newman*, 975 S.W.2d at 154 (citing *Nesselrode v. Executive Beechcraft, Inc.*, 707 S.W.2d at 378). Furthermore, the perceived need to define "unreasonable dangerousness" is largely satisfied by allowing the litigants "to argue that the utility of a design outweighs its risks, or that consumer expectations were violated, or any other theory of unreasonable dangerousness supported by the evidence...." *Newman* at 154.

In addition to the force of precedent that *Nesselrode* and *Newman* rejected the risk-utility approach, any further consideration of risk-utility was effectively foreclosed by the enactment of section 537.760, RSMo 1994, as part of Missouri's 1987 tort reform act, which, *inter alia*, codified section 402A of the Restatement (Second) of Torts. The verdict director for design defect cases, MAI 5th 25.04, properly tracks section 537.760, which, in turn, tracks the Restatement (Second). As noted, however, the elements of a cause of action for design defect under the Restatement (Third) are markedly different from those

under the Restatement (Second). To submit a verdict director in which the reasonable alternative design/risk-utility elements from the Restatement (Third) are substituted for the "unreasonably dangerous" standard does not comport with the statutory elements of section 537.760. Like the statute on physician-patient privilege, any change must come from the legislature.

To the extent that Suzuki's contention is merely that the reasonable alternative design/risk-utility concept should be worked into the existing verdict director under section 537.760 in order to define the terms "defect" and "unreasonably dangerous," it is also rejected. Section 537.760 was enacted approximately one year after the decision in *Nesselrode* and with full knowledge that this Court had disapproved of the use of external standards, and risk-utility in particular, to guide the jury's determination of whether a defect is unreasonably dangerous. *See Nicolai v. City of St. Louis*, 762 S.W.2d 423, 426 (Mo. banc 1988) ("In construing a statute, the Court must presume the legislature was aware of the state of the law at the time of its enactment."). By codifying section 402A from the Restatement (Second), unadorned by any definitions, the legislature tacitly adopted the *Nesselrode* approach, and now, to judicially define the terms "defect" and "unreasonably dangerous" appears to be inconsistent with legislative intent.

This Court again declines the invitation to adopt the reasonable alternative design/risk-utility theory.

## VI.

Because of the holding in parts II and III of this opinion, the judgment of the trial court is reversed, and the case is remanded for a new trial.

BENTON, C.J., PRICE, COVINGTON and HOLSTEIN, JJ., and CROW, Special Judge, concur.

WHITE, J., dissents in separate opinion filed.

WOLFF, J., not participating.

RONNIE L. WHITE, Judge, dissenting.

In 1996, in a remarkable about-face, this Court repudiated two long-standing doctrines of Missouri law and negated a jury's verdict awarding Kathryn Rodriguez compensatory and punitive damages for the devastating injuries she suffered in a Suzuki Samurai rollover accident. This Court established the new *Rodriguez* rule for admission of alcohol evidence, abandoning its own thirty-year-old, *Doisy* standard.[1] The Court also decided that its flat refusal, just six years previously, to even consider a higher evidentiary standard for punitive damages[2] was mistaken and imposed the *Rodriguez* rule requiring "clear and convincing evidence." After the case was retried under these new *Rodriguez* rules, a second jury found Suzuki liable to Ms. Rodriguez. Again today the Court nullifies this judgment, again applying rules that appear to have been invented especially for this case. First, the principal opinion rewrites this Court's exclusive constitutional jurisdiction in order to bring this case under its power. Next, the principal opinion discovers for the first time, in an 1855 statute, the rule that any non-Missouri government document is *per se* admissible, no matter how untrustworthy the matter it contains. Finally, the principal opinion replaces the "abuse of discretion" standard for reviewing trial court decisions on admissibility and cross-examination with a new standard of review that substitutes this Court's judgment for that of the trial court.

I.

Ms. Rodriguez's objection to this Court's jurisdiction is straightforward. She asserts that no real and substantial constitutional controversy exists between these parties because Suzuki does not have standing to challenge the constitutionality of section 537.675.2. As Ms. Rodriguez argues: "For a party to have standing to challenge the constitutionality of a statute, he must demonstrate that he is *adversely affected by the statute in question....* "[3] Instead of simply explaining how Suzuki is harmed by a statute that does not cause it to pay a single penny more in punitive damages than it would without the statute, the principal opinion entirely rethinks the scope and nature of this Court's constitutional jurisdiction.

This Court's exclusive jurisdiction has, since 1976, been limited to appeals involving "real and substantial" claims that a statute is unconstitutional. It is a measure of how tenuous Suzuki's claim to this Court's jurisdiction is that the principal opinion feels it is necessary to redefine this seemingly rigorous standard to include claims which are merely "plausible," that is, "superficially worthy of belief."[4] The principal opinion accomplishes this through a process of subtraction by addition, engrafting an entirely new "good faith" requirement onto the real and substantial test. Since an individual's good faith is a "concept of his own mind and inner spirit and, therefore may not be conclusively determined by his protestations alone,"[5] this seems an unsatisfactory basis for an appellate court to rest its jurisdiction upon. More disconcertingly, the principal opinion determines that plausible claims "necessarily are made in good faith." To the contrary, one could easily imagine that a

---

1. *Doisy v. Edwards*, 398 S.W.2d 846 (Mo. 1966).

2. *Menaugh v. Resler Optometry, Inc.*, 799 S.W.2d 71, 75 (Mo. banc 1990).

3. *W.R. Grace & Co. v. Hughlett*, 729 S.W.2d 203, 206 (Mo. banc 1987) (emphasis in original).

4. Webster's Third New International Dictionary 1736 (1966).

5. Black's Law Dictionary 693 (6th ed.1990).

litigant, having once received a favorable ruling from this Court, might concoct a superficially pleasing but substantively meritless argument, one in which it has no good faith belief, for the sole purpose of seeking a hearing before this Court. We should not encourage such tactics. In contrast to the nebulous and credulous "good faith plausibility" standard the principal opinion adopts, this Court's previous jurisprudence, which required a litigant to demonstrate that he was harmed by the operation of an allegedly invalid statute, provides a workable method for separating real and substantial constitutional controversies from cynical attempts at forum shopping.

Having lowered the jurisdictional bar to admit all plausible claims of statutory invalidity, the principal opinion reduces the standard even further and holds that a real and substantial claim is one that is merely novel. It is, of course, true that no real and substantial controversy over the constitutionality of a statute exists where this Court has already decided the question. But this does not mean that novelty is, in and of itself, an indication of an argument's substantiality. Such a rule is not only not supported by the cases cited in the principal opinion,[6] it is also contrary to common sense. The range of issues upon which this Court has never specifically ruled is endless. It should hardly need to be stated that the more unlikely a claim is to succeed, the less likely it will have been argued and ruled on before, a fact

that does not make the claim any more real or substantial.[7]

The principal opinion cites *Riche* as a paradigm example of the rule that a claim is real and substantial because it is novel. *Riche* involved a real and substantial constitutional challenge not just because the issue had not been previously decided by this Court, but also because Mr. Riche was undoubtedly harmed by the operation of section 302.505, the statute under which his driver's license was suspended. In short, he had standing. This case is not like *Riche*. If Mr. Riche had conceded the constitutionality of section 302.505, but the Director of Revenue, arguing against his own interest, had, nevertheless, claimed that section 302.505 was unconstitutional, then the cases would be similar. While I agree that novelty is necessary for a constitutional controversy to be real and substantial, it is clearly not sufficient. A real and substantial claim of statutory invalidity is also one where the party raising the argument has standing to do so. To ignore this factor is to hold that any party can invoke this Court's jurisdiction whenever it desires, merely by challenging the constitutionality of a statute, whether there is any real controversy at all between the parties as to the statute in question.

There is no such controversy here. While the principal opinion makes much of the novelty of a challenge to this statute by a defendant, the reason no defendant has ever challenged such a statute is because a defendant, unlike a plaintiff, has

6. The citations to *State ex rel. Doniphan Tel. Co. v. Public Serv. Comm'n* and *Swift & Co. v. Doe* are outdated, since the jurisdictional question in those cases was one of construction, not validity, a topic that has, as the majority notes, not been relevant to our exclusive jurisdiction since 1976, 369 S.W.2d 572, 574–75 (Mo.1963) ("Doniphan ... makes no attack upon the validity or constitutionality of the statutes defining the powers of the Commission...."); 311 S.W.2d 15, 22 (Mo.1958) ("Since it appears that it is not essential to a decision ... that we determine the only point raised by defendants which might require a construction of the constitution of this state

..., we do not have appellate jurisdiction....").

7. *See, e.g., Vestal v. Clinton,* 106 F.3d 553, 554–555 (4th Cir.1997) (per curiam) (dismissing as frivolous an appeal involving the question, apparently one of first impression, of whether President Clinton violated "the laws of God" by swearing his inauguration oath on the New Testament, and also holding frivolous the claim that the Privileges and Immunities Clause entitles prisoners to better televisions and personal computers).

no interest in doing so. In the only case cited by the Court supporting the idea that this statute is possibly unconstitutional, it was the plaintiff, successfully making the arguments that were rejected by this Court in *Fust*,[8] who sought a declaration that the Georgia "split recovery" statute was unconstitutional, a position that was opposed by the defendant.[9] Indeed, it is recognized that the purpose of extraction statutes generally is "to discourage punitive damages claims by making them less remunerative to the plaintiff and his attorneys." [10] *McBride* itself finds the Georgia statute an "arbitrary and unreasonable provision [that] is business oriented, designed to restrict injured plaintiffs of an incentive to bring actions to punish, penalize, or deter egregious business practices." [11] The principal opinion itself argues that the public policy purpose of Missouri's extraction statute is to ensure that "plaintiffs should not receive the windfall of full punitive damage awards." In *Fust*, this Court categorically rejected claims that this statute was unconstitutional when enforced against plaintiffs. It is disingenuous, at best, for the principal opinion to now maintain that such claims raise a legitimate threat of constitutionally prohibited harm when viewed "from a defendant's perspective."

The principal opinion eventually finds that Suzuki has standing "because judgment was entered against Suzuki in accordance with and as a result of the putatively illegal requirement of section 537.675. . . ." If this is so, it is not reflected in the judgment provided by Suzuki in the record on appeal, which indicates that the full amount of punitive damages was entered in favor of Ms. Rodriguez. Inexplicably, the principal opinion holds that "the fact that the full punitive damages award might

lawfully be imposed in favor of plaintiff does not mean that Suzuki lacks the standing to allege that a portion of the punitive damages award was unlawfully imposed in favor of the state." This is exactly backwards. What actually happened here was that the full punitive damages were imposed in favor of Ms. Rodriguez; Suzuki never alleges, and the record does not reflect, that a portion of the punitive damages award was imposed in favor of the State. Under section 537.675.3, the State has no present interest in this litigation. While the attorney general may, some day, attempt to collect upon this judgment, apparently in a separate action against one of the parties,[12] that has not happened here. Suzuki does not point to any action by the trial court attempting to enforce this statute against it. The argument advanced by the principal opinion on Suzuki's behalf is clearly not ripe for adjudication in this appeal. Indeed, it is entirely possible (albeit unlikely, given the weakness of Suzuki's arguments) that the trial court would agree with Suzuki and would refuse to allow the State to collect its half of the judgment, if it ever sought to do so. The argument the principal opinion ascribes to Suzuki is not germane to this appeal, in which the State is not a party and in which the State has no interest. Perhaps Suzuki would have standing to raise this claim in some future collection action by the State. But of course, it is unlikely to do so, since, as the principal opinion appears to concede, it would have nothing to gain from making such an argument except an increased "windfall" payment to Kathryn Rodriguez.

Ultimately concluding, perhaps, that Suzuki's claim is so transparently pretextual that it might not even meet its new, per-

---

**8.** *Fust v. Attorney General,* 947 S.W.2d 424 (Mo. banc 1997).

**9.** *McBride v. General Motors Corp.,* 737 F.Supp. 1563 (M.D.Ga.1990).

**10.** *Gordon v. Florida,* 585 So.2d 1033, 1037 (Fla.App.1991).

**11.** 737 F.Supp. at 1578.

**12.** *See Finley v. Empiregas Inc.,* 28 F.3d 782, 785–86 (8th Cir.1994).

missive jurisdictional standard, the principal opinion hedges its bets by alluding to this Court's discretionary jurisdiction under article V, section 10. As the principal opinion states, this Court has the power to order a case transferred from the court of appeals prior to opinion. The principal opinion, however, does not actually exercise that power here, merely referring to this as an "alternative and independent ground" for jurisdiction. But these alternatives are mutually exclusive. If this Court has exclusive jurisdiction then it may not, by definition, transfer the cause from the court of appeals, and, conversely, if the cause is ordered to be transferred to this Court, then that requires a holding that jurisdiction was originally proper in the court of appeals.

This is no mere semantic distinction. Where, as here, a party who has previously received a favorable ruling from this Court goes to great lengths to acquire jurisdiction in this Court and the opposing party equally strenuously opposes our jurisdiction, this Court must be clear as to the basis by which it exercises its power. It is one thing to hold that this Court has no choice but to entertain this appeal. But to exercise discretionary jurisdiction against one party, without even identifying what questions the Court considers to be "of general interest and importance," borders on the arbitrary. As the principal opinion notes, Suzuki has, throughout this litigation, argued that the case presented matters of general interest and importance. It is equally true, however, that Suzuki's chief claim to importance of this case is based upon the size of the verdicts rendered against it. None of Suzuki's numerous jurisdictional allegations in this appeal and in *Rodriguez I* have failed to mention, usually in the first line, the exact eight-figure damages awards it has been found liable for. None of these jurisdictional statements mention any substantive ground for jurisdiction before remarking on the "stunning $25 million compensatory award," or decrying the jury's "runaway verdict." It can hardly be doubted that Suzuki has concluded that the size of a verdict is what renders an appeal of interest to this Court. If the Court exercises its power to transfer this cause without even identifying the supposedly important questions of law it decides, the impression that it is the size of the verdict which is important is reinforced. In my view, the size of a verdict has no bearing on the general interest or importance of a question of law and I would not exercise this Court's power to transfer this case prior to opinion.

It is important to resolve the basis of this Court's jurisdiction for a more practical reason as well. Because the principal opinion determines that there will be a third trial in this case, and because it determines that the constitutional questions raised by Suzuki are real and substantial, but declines to answer them, the Court has ensured that any appeal from *Rodriguez III* will proceed before this Court and not before the court of appeals.

Suzuki's claims to this Court's jurisdiction are a pretense. None of the three statutes Suzuki purports to challenge substantively affected this litigation in any way detrimental to Suzuki, and Suzuki, therefore, has no standing to contest their constitutionality. This Court has no jurisdiction over this appeal, and this matter should be transferred to the court of appeals. Given that the Court has, nevertheless, determined to exercise jurisdiction over this appeal, I will respond to the two points upon which the judgment is reversed.

## II.

The principal opinion concludes that section 490.220 creates a special rule abrogating the common law of public records for non-Missouri documents, a conclusion that is completely inconsistent with the history of this provision. The General Assembly enacted this section in 1855 to deal with a

specific, narrow·problem.[13] In order to enforce the Full Faith and Credit Clause,[14] Congress had passed a law requiring that:

> All records and exemplifications of office books, which are or may be kept in any public office of any State, not appertaining to a court, shall be proved or admitted, in any other court or office, in any other State, by the attestation of the keeper of said records or books, and the seal of his office thereto annexed, if there be a seal, together with a certificate of the presiding justice of the court of the county or district, as the case may be, in which such office is or may be kept ...; and the said certificate ... shall be further authenticated by the clerk or prothonotary of the said court, who shall certify under his hand and the seal of his office, that the said presiding justice is duly commissioned and qualified.... [15]

Thus, in order to authenticate a foreign official document, a litigant was required to obtain not just the seal of the official, but the seal of the presiding judge of the foreign court, as well as the seal of the clerk that such judge was the presiding judge. This encouraged somewhat absurd technicalities, as described in *Paca v. Dutton*.[16] In that case, this Court refused to allow a slave suing for freedom to introduce a deed of manumission recorded in a Hartford County, Maryland, public office, because the clerk's certificate reported that the certifying judge was "the presiding judge of the district composed of Baltimore and Hartford Counties, without saying he is presiding judge of any court whatever." [17] The General Assembly, in its wisdom, decided to provide relief from this morass of technicalities by enacting a statute that exactly followed the federal law, but omitted the requirement that the document be certified by anyone other than the responsible official. In order to eliminate any doubt that this is precisely what it intended, the 1855 Assembly's official statutory compilation refers the reader of section 490.220's predecessor to an appendix, where the federal act is reproduced, and *Paca* is specifically cited.[18] Section 490.220 was solely intended to overcome this Court's hypertechnical reading of the federal law and to reduce the problems of proof associated with showing that records presented were actually the records they purported to be. Nothing in the statute was intended to abrogate Missouri's unitary common law principles related to the hearsay exception for public documents.

This statute was not intended to create a special class exempt from the common law of public records; Missouri courts have consistently applied common law rules to documents authenticated under this section. One well-recognized common law doctrine, established in Missouri since at least 1840,[19] is the public duty rule:

> Not all documents which have been prepared by a public official and filed in a public office and which are in a sense public documents are admissible in evidence to prove the truth of their contents. A document is not admissible as a public record merely because it is authenticated as an official record or is kept in the working file of a governmental agency. A record is not admissible unless it was made for public use, and the official had a duty to make the record, imposed by law, or implied by the nature of the office, and was authorized either by express statute or by the nature of his duties to make it.[20]

13. Ch. 62, sec. 42, RSMo 1855.

14. U.S. Const. art IV, sec. 1.

15. Act of March 27, 1804.

16. 4 Mo. 371 (1836).

17. *Id.* at 373.

18. Appendix p. 1603, RSMo 1855.

19. *Moore v. Bank of the State of Missouri*, 6 Mo. 379 (1840).

20. 32A C.J.S. Evidence sec. 836.

Although the public duty requirement does not appear on the face of the statute, Missouri courts, from the time the statute was enacted, have applied the public duty rule to determine if a document authenticated in accordance with statute is admissible as a public record.[21] Indeed, the majority opinion itself does so at notes 3, 4 and 5, analyzing the statutory authority of NHTSA and the office of the Federal Register to disseminate the reports at issue here, a discussion that is completely unnecessary unless the public duty rule applies. Thus, it is hardly "inexplicable" that the treatises cited in the principal opinion do not separately discuss the common law rules for Missouri and non-Missouri official documents. Missouri courts have established a single common law of public documents, which applies equally to the documents of other jurisdictions.

This doctrine includes the widely recognized common law rule that the public records exception applies only to matters of fact: "As a general rule, where some enactment or rule of law requires or authorizes a public official to make a certificate or written statement as to some matter or fact pertaining to and as a part of his official duty, such writing is competent evidence of the fact therein recited."[22] *Kansas City Stock Yards* was not the first Missouri case to make an explicit distinction between facts and conclusions contained in a public document. More than forty years earlier, for instance, it was established that a coroner's inquisition was

competent evidence as to the fact of death, but that its conclusions as to the cause of death were completely inadmissible.[23] Long before *Kansas City Stock Yards*, Missouri cases describing the exception leave little doubt that it was intended to deal with matters of a factual nature: "Such a record is competent evidence of the facts stated in it, according to the great weight of authority.... : 'A record or document kept or prepared by a person whose public duty it is to record truly the facts stated therein is, when relevant, admissible as prima facie evidence of such facts....'"[24] Thus, *Kansas City Stock Yards* was hardly an aberration produced by misquoting the C.J.S., as the principal opinion implies. That case merely recited the public records exception as it had long been understood in Missouri, a view that was the prevailing common law rule at the time. As the principal opinion says, this common law rule has been abrogated in the majority of jurisdictions, but only where it has been replaced by enactment of a specific, narrow "investigative reports" exception modeled on Federal Rule 803(8)(c).

As described by the United States Supreme Court in *Beech Aircraft v. Rainey*, Federal Rule 803(8)(c) was enacted by the Congress in the early 1970's. This rule abrogated the federal common law rule that, like Missouri's, excepted factual statements in public documents from the hearsay rule, but excluded opinions and conclusions from evidence.[25] Congress re-

---

21. *Howell, Jewett & Co. v. Caryl & Co.,* 50 Mo.App. 440, 448-49 (1892) (holding Kansas record of mortgage deed inadmissible under statute because record was not required to be recorded); *Florscheim & Co. v. Fry,* 109 Mo. App. 487, 84 S.W. 1023, 1023-24 (1905) (foreign office record inadmissible under statute because no evidence was presented showing it was required to be kept by Illinois statute); *State v. Hendrix,* 331 Mo. 658, 56 S.W.2d 76, 78-80 (1932) (discussing lack of evidence that prison officials of Oklahoma and Kansas were required by law to keep certain factual information regarding an inmate).

22. 32A C.J.S. Evidence, sec. 834.

23. *Queatham v. Modern Woodmen of America,* 148 Mo.App. 33, 127 S.W. 651, 654-55 (1910).

24. *Wheeler v. Fidelity & Casualty Co. of New York,* 298 Mo. 619, 251 S.W. 924, 931 (1923) (quoting 22 C.J. 801); *see also Priddy v. Boice,* 201 Mo. 309, 99 S.W. 1055 (1906).

25. 488 U.S. 153, 161-71, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988); *see, e.g., Franklin v. Skelly Oil,* 141 F.2d 568, 571-72 (10th Cir.1944) (excluding conclusions and opinions of State Fire Marshal, whose factual record would have been admissible).

placed the fact/opinion distinction with several important safeguards that significantly qualify the principal opinion's blanket assertion that "United States Government reports, conclusions and all, are routinely admitted" in federal court. First, the exception applies only to a specific kind of government documents, those containing: "factual findings resulting from an investigation made pursuant to authority granted by law...." More important, as the *Rainey* Court explained, is the "primary safeguard" written into the rule, the proviso that evidence is excludable where "the sources of information or other circumstances indicate lack of trustworthiness." As the Court says, "a trial judge has the discretion, and indeed the obligation, to exclude an entire report or portions thereof—whether narrow 'factual' statements or broader 'conclusions'—that she determines to be untrustworthy." [26] The omission of any similar safeguard from the rule the majority announces today is especially significant in this case. Ms. Rodriguez presented extensive evidence to the trial court, including depositions and company memoranda, to support her claim that the 1988 NHTSA decision not to recall the Samurai was the product of an extensive lobbying campaign and had little to do with the merits of the petition. While I wish to imply no view as to the merits of this claim, it certainly bears on the trustworthiness of the report and would be an important matter for the trial court to consider in litigation conducted pursuant to the federal "investigative report" exception, or any similar rule.

In contrast, the absolute rule announced by the principal opinion today

holds that such a report, indeed everything in the federal register, is *per se* admissible, regardless of any concerns about its trustworthiness. By taking a narrow nineteenth-century authentication rule completely out of context, the principal opinion creates the most liberal government documents rule in the country, and an unworkable one, at that. While hearsay, speculation and conjecture may be sufficient for the routine regulatory work of a typical federal agency, they hardly bear the indicia of reliability one would normally expect from material to be admitted without the right to cross-examine the declarant.[27]

The principal opinion compounds this error by holding that, even though the information contained in the NHTSA reports was actually presented to the jury through Suzuki's experts, it was reversible error not to admit the reports themselves. This conclusion is troubling, and not just because it is clearly contrary to our decisions emphasizing that a trial judge has wide discretion to exclude cumulative evidence.[28] Of more concern is the notion that the exclusion of this evidence was prejudicial because the source (NHTSA) was more credible than the expert witnesses who testified on Suzuki's behalf. This notion subverts the very idea of adversary justice. Our system is based on the idea that the best way to discern the truth or falsity of a proposition is to test it by cross-examination. If, as the majority holds, the opinions and conclusions of a faceless official who cannot be cross-examined are more probative than the live testimony of an expert qualified and examined in adversary proceedings, then what the majority

**26.** *Id.* at 167.

**27.** *See, e.g.,* 63 Fed.Reg. 19,167 (1998) (proclaiming that accidents caused by defective products produce a "cost in terms of human suffering [that] is immeasurable."); 63 Fed. Reg. 66,227 (1998) (reporting the hearsay opinion of an (unidentified) optometrist that a particular Missouri truck driver with a vision defect "is capable of operating a C[ommerical] M[otor] V[ehicle]," and the opinion of

his employer that he is "an outstanding employee," as well as the summary conclusion that this person "has had many years to adapt his driving skills to accommodate his vision defect."); 56 Fed.Reg. 8780–81 (1991) (opining that black, female or disabled workers are more costly for firms to employ).

**28.** *Hansome v. Northwestern Cooperage Co.,* 679 S.W.2d 273, 276 (Mo. banc 1984).

is endorsing is trial by bureaucracy. While a party challenging the official view is entitled to put on contrary evidence, such evidence would be subject to cross-examination and impeachment, not least by the report itself, a report that the principal opinion finds more probative than actual testimony, merely because it has an official seal on the cover.

It was not an abuse of discretion for the trial court to refuse to admit the opinions and conclusions in the NHTSA reports.

### III.

This Court's abuse of discretion review standard is quite severe:

> Judicial discretion is abused when a trial court's ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration; if reasonable men can differ about the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion.[29]

In this case, however, it appears that the Court has abandoned this extremely rigorous standard of review and is instead substituting its own discretion for that of the trial court.

Nowhere is this clearer than in the principal opinion's discussion of Suzuki's attempts to impeach Dr. Nalecz's testimony by raising what the trial court found to be collateral matters. The only support for the conclusion that the trial court abused its discretion in excluding this evidence is a citation to *Callahan v. Cardinal Glennon Hosp.*, a case that, read fairly, completely undercuts the majority opinion:

> It is well established that the extent and scope of cross-examination in a civil action is within the discretion of the trial court and will not be disturbed unless an abuse of discretion is clearly shown. This is especially true for cross-examinations of expert witnesses. There is wide latitude to test qualifications, credibility, skill or knowledge, and value and accuracy of opinion. Further, the pecuniary interest, bias or prejudice of a witness is not collateral and can always be shown subject to the limitations imposed by the trial judge in his sound discretion.[30]

The principal opinion completely turns the sense of the holding on its head. *Callahan* is not a case holding that litigants must be given a free rein to impeach experts on collateral matters. The case actually holds that the cross-examination of an expert is a matter especially within the trial court's discretion. The "wide latitude" the majority points to is that which the trial court may give the litigants on such matters. However, the determination of "[h]ow far this inquiry may go into the details of the interest or prejudice is left for the trial court to decide."[31]

The present matter precisely illustrates the rationale underlying this principle. The question of whether one complex computer simulation program is the same as or different from another computer simulation program is not the type of inquiry that appellate judges are uniquely well trained to resolve. Yet the principal opinion is willing to brand the trial court's action arbitrary, unreasonable and ill-considered even though, having tried this case once, and having heard extensive argument and briefing on the topic, the trial judge concluded that the material was collateral and inadmissible. This conclusion matches that of another trial judge who was intimately familiar with the technical issues presented. He also prohibited the impeachment of Dr. Nalecz by one of the same memoranda offered here, on the grounds that it did not relate to the same

---

**29.** *Shirrell v. Missouri Edison Co.,* 535 S.W.2d 446, 448 (Mo. banc 1976).

**30.** 863 S.W.2d 852, 868–69 (Mo. banc 1993) (citations omitted).

**31.** *Id.* at 869.

software program used in this matter.[32] I do not pretend to be a software expert. Perhaps the majority has some insight into these issues that leads it to conclude that its judgment on this question is so superior to that of two trial judges who have closely considered these matters that it is willing to conclude that no reasonable person could hold a different view. But evidence of that does not appear in the principal opinion. The principal opinion has not reviewed this point under an abuse of discretion standard, at least not one that bears any resemblance to the abuse of discretion standard previously employed by this Court. The principal opinion's decision to substitute its own judgment for the trial court's on this point is not supported by *Callahan* or any other precedent.

## IV.

Departing from this Court's usual practice, the principal opinion gratuitously reviews a number of Suzuki's additional points on appeal, out of a concern for "the substantial litigation expenses that will be borne by all of the parties." Despite this concern, several of the points raised here are certain to reoccur during the third trial, but have not been addressed by the Court. In particular, the Court has determined to allow the retrial to proceed under the cloud of what the principal opinion deems "real and substantial" constitutional questions. As the majority states, this Court "generally declines" to address a constitutional question, and, indeed, any question, where a case may be decided on other grounds. As the Court notes, however, this case is unusual, a judgment reflected in its decision to rule on many of the non-constitutional claims raised by Suzuki, which are likely to reoccur at the third trial. No policy or doctrine requires *Rodriguez III* to proceed under the cloud of supposedly substantial constitutional questions, questions that will inevitably have to be answered by this Court at some

point in this litigation. If the Court is truly of the opinion that these are serious claims of a constitutional dimension, that point should be today.

Even more troubling than the Court's reservation of these issues for *Rodriguez III*, is the fact that this opinion, which signals that this Court will not adhere its usual abuse of discretion standard in evaluating trial court error in this matter, has now rendered this case virtually untriable. As the trial judge stated:

> It is the responsibility of the Court to keep the trial focused and not diverging down thousands of little paths of slight connection to the real issues. This trial was long and arduous for the jurors. In a trial such as this the judge must make thousands of decisions to keep the testimony and information centered on the main issues in the lawsuit. The 177 errors recited by defendant Suzuki in their motion for new trial gives an indication of how many different directions the twelve plus defense lawyers were aiming in this lawsuit.

As the trial judge notes, the multiplicity of attorneys in this case required her to rule on the relevance of everything from the sexual proclivities of expert witnesses to the wreck of Princess Diana's car in Paris. It is clear from today's opinion that this Court has determined to remove from the trial judge any ability to limit the case to matters she determines are relevant. If anything, the long ordeal of Kathryn Rodriguez and Suzuki Motor Company is further than ever from resolution.

There is much more at stake here than "litigation expenses." Kathryn Rodriguez is a real person. She is thirty-four years old and has spent the last nine years of her life paralyzed from the shoulders down. While this does not mean that she automatically deserves anything from Suzuki, what she deserves from this Court is the same thing it owes all Missouri litigants: a speedy, just, and final resolution of her

---

**32.** *Livingston v. Isuzu Motors,* 910 F.Supp. 1473, 1498 (D.Mont.1995)

claim. It is unfortunate this Court voided the first trial in *Rodriguez I* by overruling two longstanding precedents under which that trial was conducted. *Rodriguez II* nullifies the massive investment in time, talent, energy and money it took to retry this arduous, complicated case. This seriously undermines the appearance of justice for Ms. Rodriguez, who now faces the ordeal of a third marathon trial. Even now, however, the Court refuses to address the supposedly real and substantial constitutional questions that have been raised in the previous two appeals. As much as I dislike the waste inherent in the Court's decision that there will be a *Rodriguez III*, I think it is simply unconscionable for the Court to fail to do what it can to prevent a possible *Rodriguez IV.*

For these reasons, I cannot join the principal opinion.