**In The Matter of the Care and Treatment of Angela M. COFFEL, Respondent/Appellant.**

**No. ED 79989.**

Missouri Court of Appeals,
Eastern District,
Division Five.

March 4, 2003.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 5, 2003.

Case Transferred to Supreme Court July 1, 2003.

Case Retransferred to Court of Appeals Oct. 28, 2003.

Original Opinion Reinstated Nov. 3, 2003.

---

Nancy L. Vincent, St. Louis, MO, for appellant.

Jeremiah W. (Jay) Nixon, Attorney General, Theodore A. Bruce, Jefferson City, MO, for respondent.

LAWRENCE G. CRAHAN, Judge.

Angela Coffel appeals the judgment entered following a bench trial declaring her to be a "sexually violent predator" pursuant to sections 632.480 through 632.513 RSMo 2000[1] and ordering her committed for an indefinite period to the custody of the Director of the Department of Mental Health for treatment. We find that the judgment is not supported by substantial evidence and is against the weight of the evidence. Accordingly, we reverse the judgment and remand with directions to discharge Ms. Coffel from custody.

In October 1994, when Angela[2] was eighteen years old, she was at a neighbor's house where she sometimes assisted in cleaning. Two boys, ages eleven and thirteen were also at the house, as was the neighbor, who was in another room. At some point, someone suggested that Angela and the boys play "Truth or Dare," a children's game in which each party must either tell the truth in response to a question or do something they are dared to do. In response to a dare, Angela briefly took

---

1. All statutory references are to RSMo 2000 unless otherwise indicated.

2. We use Ms. Coffel's given name throughout this opinion as an aid to description. No disrespect is intended.

the penis of each boy into her mouth.[3] When the boys later learned that Angela was HIV-positive, they reported the incident to their mother, who called the police. Angela admitted to the basic facts of the incident, although she told a Lincoln County family services worker that she thought the boys were older.

Angela was taken into custody and later pled guilty to two counts of sodomy arising from the incident. While on bond and awaiting sentencing, Angela engaged in consensual sexual relations with Timothy Ahrens, a fifteen year-old who claimed that Angela denied she was HIV-positive. He later confirmed that Angela had been diagnosed as HIV-positive. Although Angela was never charged as a result of this incident, the sentencing court was made aware of the details.

As part of her presentence investigation, Angela was evaluated by Marie Clark, an expert in the treatment of sexual offenders. She concluded that Angela's behavior was not predatory in the clinical sense of a person who preys on others or seeks out others to prey upon sexually or to abuse or harm them in some way. The probation officer recommended probation. Angela was sentenced to five years in the custody of the Department of Corrections.

In April of 2000, as Angela was approaching her scheduled release date of July 31, 2000, an End of Confinement Report was prepared by Rebecca Woody, M.A., an associate psychologist at the Farmington Correctional Center. Ms. Woody is not a licensed psychiatrist, psychologist or clinical social worker and thus is not qualified to diagnose or testify in Missouri. *In re Johnson,* 58 S.W.3d 496, 498 (Mo. banc 2001). This report reviewed Angela's conduct violations during her incarcerations, her participation in and failure to complete the Missouri Sexual Offender Program ("MOSOP"), her "criminal" history[4] gleaned largely from admissions she made in an interview, psychiatric history (again, gleaned largely from the interview) and diagnostic summary. The report states that Angela appears to have the mental abnormalities of antisocial personality disorder, sexual sadism and alcohol abuse. Noting Angela's perceived lack of remorse or concern about the possibility of infecting others with HIV and her history of promiscuity, the report concludes that Angela is more likely than not to reoffend and that she may therefore meet the criteria of a sexually violent predator as defined in section 632.480(5).[5]

The report was forwarded to the Attorney General and the matter was referred

3. The accounts of those present are conflicting as to certain details, such as who initiated the dare, but we find nothing in any of the accounts that would suggest that the conduct was anything more than an act of bravado, that it was undertaken for the purpose of sexual gratification of either Angela or the boys, or that either boy experienced an orgasm.

4. The sodomy counts for which Angela pled guilty are her only criminal convictions. However, under the heading of "criminal" history, the report details Angela's admission of "gang activity," promiscuity and prison conduct violations which do not constitute crimes.

5. Section 632.480(5) defines a "sexually violent predator" as "any person who suffers from a mental abnormality which makes the person more likely than not to engage in predatory acts of sexual violence if not confined in a secure facility and who: (a) has pled guilty or been found guilty, or been found not guilty by reason of mental disease or defect pursuant to section 552.030, RSMo, of a sexually violent offense; or (b) has been committed as a criminal sexual psychopath pursuant to section 632.475 and statutes in effect before August 13, 1980."

to a multidisciplinary team designated pursuant to section 632.483.4. The multidisciplinary team concluded that Angela did not meet the definition of sexually violent predator. This assessment was made available to the Attorney General and to the prosecutors' review committee pursuant to section 632.483.5. The prosecutors' review committee concluded that Angela did meet the definition of a sexually violent predator. Based on that determination, on June 22, 2000, the Attorney General filed a petition requesting the court to find cause to believe Angela is a sexually violent predator, order Angela to be taken into the custody of the Sheriff of Lincoln County and placed in a secure facility, set a hearing date for a finding of probable cause and, if probable cause was found, to hold a trial on the merits.[6]

The next day the trial court entered an order finding, based on the allegations of the petition, that there was probable cause to believe Angela is a sexually violent predator. The court ordered the Sheriff to assume custody, appointed the Public Defender to represent Angela and set a date for a probable cause hearing, which was later continued. On August 25, 2000, following a hearing, the trial court entered an order finding that there was probable cause to believe that Angela is a sexually violent predator and ordering Angela transferred to the Fulton State Hospital[7] for an evaluation. The court further ordered that the evaluation be performed by a psychiatrist or psychologist who was not a member of the multidisciplinary team to determine: (1) whether Angela suffers from a mental abnormality; and (2) if so, whether the mental abnormality makes Angela more likely than not to engage in predatory acts of sexual violence ("predatory" acts defined as acts directed towards strangers or individuals with whom relationships have been established or promoted for the primary purpose of victimization.) A report of the examination was ordered to be filed with the court and forwarded to the parties within sixty days.

On October 30, 2000, Dr. Richard Scott, Ph.D, a licensed psychologist and forensic examiner for the Missouri Department of Mental Health,[8] submitted a 12 page report of his evaluation of Angela. Dr. Scott noted Angela's family history included significant physical and emotional abuse. Angela and her younger brother had each been removed from the home at various times. At the time of Angela's offense, her brother was in the custody of the Department of Family Services because he had raped Angela. Angela witnessed extensive promiscuity on the part of both of her parents, both of whom have also had problems with substance abuse. Assessments of Angela's intellectual abilities have consistently placed her at the high end of the borderline range or at the low end of the low average range. She dropped out of school in the tenth grade. Her initial evaluation by the Department of Corrections placed her reading abilities at the first-grade level, which Angela claimed had improved significantly through her participation in educational activities while incarcerated. Dr. Scott considered Angela to

---

6. We note that the Attorney General did not file a copy of the assessment of the multidisciplinary team with the petition as required by section 632.486.

7. Throughout the trial, most witnesses referred to the unit where Angela was held as "Biggs," which is apparently the name of the unit where Angela is being detained.

8. Dr. Scott has appeared as an expert witness on behalf of the State in other cases seeking to have sexual offenders declared sexually violent predators. *See, e.g., In re Coffman*, 92 S.W.3d 245 (Mo.App.2002).

be very knowledgeable about her HIV status and her medications and noted she understood basic issues of viral transmission and precautions.

Based on his interview and available records, Dr. Scott found that Angela has historically used sexual activity as a means of gaining the interest, affection and acceptance of others. Angela told Dr. Scott in the interview that she has been with five persons in consensual relationships, three males and two females. On other occasions, however, she has claimed to have performed oral sex on a far greater number of male partners.

Dr. Scott diagnosed Angela with the following disorders: disorder of written expression; reading disorder; alcohol abuse in a controlled environment; cannabis abuse in a controlled environment; borderline personality disorder; and antisocial personality disorder. He stated that neither of the substance abuse disorders qualify as a mental abnormality within the meaning of the statute because neither creates a predisposition to sexually violent behavior. He stated that borderline personality disorder is a severe personality disorder which is associated with sexual promiscuity but is not related to sexually violent behavior. Although antisocial personality disorder may qualify as a mental abnormality, he found nothing that suggested that Angela's antisocial behavior is related in any way to her sexual behavior, which he felt was better explained by borderline personality disorder. He specifically disputed the End of Confinement Report's speculation that Angela is a sexual sadist, noting that such conclusion was based on an incorrect assumption that she risked transmitting HIV with her saliva in committing her offense. Dr. Scott stated

unequivocally that this is incorrect because saliva does not transmit HIV.

As for the likelihood that Angela would engage in sexually predatory acts in the future, Dr. Scott stated that the overall base rate for sexual recidivism among women who sexually offend is unknown. Research to date suggests that the rate is extremely low (less than 3 percent in one study and 0 percent in another). However, those studies have small samples. No large-scale studies of female sexual offenders have been reported to date. Accordingly, Dr. Scott opined that it could appropriately be said that the overall rate of re-offense by female sexual offenders is unknown, but likely to be extremely low.

Dr. Scott found that Angela does not have a paraphilia (a sexually related disorder in which a person achieves arousal from non-consenting or non-human partners).[9] Although Angela has not completed the MOSOP program, Dr. Scott noted that no accommodation was made for her severe learning problems in MOSOP. Dr. Scott found nothing in the records suggesting that Angela has ever "preyed" upon others in a sexual way. Although it is conceivable that Angela could in the future find herself in a position of being asked by a juvenile to engage in sexual behavior, Dr. Scott opined that it is extremely unlikely that she would comply. In specific response to the questions posed by the court, Dr. Scott stated:

This examiner has evaluated a substantial body of information related to the respondent and her risk for sexual offending.

1. In the opinion of this examiner with a reasonable degree of psychological certainty, the respondent suffers

---

9. Pedophilia, sexual sadism and exhibitionism are types of paraphilias. They are concisely explained in *Note, Freedom Is to Confinement* as *Twilight Is to Dusk: The Unfortunate Logic of Sexual Predator Statutes,* 67 Mo. L.Rev. 993, 996 (2002).

from a mental disorder that may qualify as a mental abnormality, Antisocial Personality Disorder. However, this examiner finds no relationship between this disorder and the sexual offense that led to the respondent's incarceration.

2. In the opinion of this examiner with a reasonable degree of psychological certainty, the respondent is *not,* as a result of mental abnormality, more likely than not to engage in predatory acts of sexual violence if not confined to a secure facility. (emphasis in original).

Despite Dr. Scott's conclusions, the State elected to proceed to trial. At trial, the State had the burden of proving, beyond a reasonable doubt, that Angela (1) has a congenital or acquired condition affecting her emotional or volitional capacity that predisposes her to commit sexually violent offenses to a degree that causes her serious difficulty in controlling her behavior; and (2) that she is more likely than not to engage in predatory acts of sexual violence if not confined. Sections 632.480(2), 632.480(5), 632.495; *Thomas v. State,* 74 S.W.3d 789, 791–92 (Mo. banc 2002).

Viewed in the light most favorable to the judgment, the State's evidence was as follows. Philip Catanzaro testified that he engaged in consensual sexual relations with Angela when he was twenty years old and she was seventeen. He said that she initiated the contact by unzipping his pants and engaging in oral sex. During oral sex she bit him a couple of times but he did not complain that it was uncomfortable. They also had intercourse for which he used a condom. He later confronted Angela as to whether she was HIV-positive. She denied being HIV-positive and told him she had cancer in her ovaries, as she had told him before intercourse. He took

her to her parents' home and confirmed that she was HIV-positive. He was later misdiagnosed as HIV-positive, but has since confirmed that he is not.

Brian Buckley, a former prison guard at the Renz Correction facility, related a conduct violation by Angela in November 1997, in which Angela had her jumpsuit unzipped, exposing her breasts, in an area where male inmates could observe her. Such "flashing" was not uncommon among inmates. He also related an incident in August 1997, in which Angela was found to be in another inmate's cubicle, which is a violation of prison rules.

John Beauchamp of the Lincoln County Sheriff's Department related the details of his investigation and arrest of Angela on the charges for which she was incarcerated. He identified statements taken from the boys indicating it was Angela's idea to "suck their dicks." His police report was admitted into evidence. Amanda Rose of the Lincoln County Division of Family Services also testified as to her investigation of the incident. She said Angela was very upset when she interviewed her. Angela told her the boys were "touching her horny spots" and admitted she had "sucked dick on the boys," who Angela claimed had lied about their ages. Angela made no reference to drinking on the day in question.

Kent Travis, another former guard at Renz, related a conduct violation by Angela that occurred in October 1996. Travis stated that Angela pressed her front into him and did not move away until he asked her to a second time. Although he filed a charge of sexual misconduct, Angela was ultimately disciplined for disobeying an order.

Daniel Esparza, another former guard at Renz, related an incident in which Angela was found in another inmate's cubicle at 12:25 a.m. He also related an inci-

dent in which he charged Angela with a violation when he observed her put her arm around another inmate and kiss her on the mouth.

Dr. Linda Davin, Ph.D., a marriage and family therapist from Nevada, was called to present data on female sex offenders she gathered for her dissertation which was completed in 1992. To gather the data, Dr. Davin interviewed seventy-six women convicted of sex offenses. The women also completed the Minnesota Multiphasic Personality Inventory (MMPI). Based on this limited data and small sample of offenders, Dr. Davin testified that male and female sex offenders differ in terms of their motivation and use of force. Men want power and women want connection. Men are more aggressive. Dr. Davin identified two types of female sex offenders: independent offenders and co-offenders. Co-offenders act with a partner, usually a male. Angela was an independent offender.

Only thirty of the seventy-six women interviewed by Dr. Davin were categorized as independent offenders. They tended to be caucasian, older than their victims, came from troubled backgrounds, were sex abuse victims themselves and had trouble with authority. The independent offenders tended to choose victims opportunistically; their crimes were not planned or arranged in advance. About a quarter of the independent offenders used games and nearly two-thirds of the offenses involved oral sex. Most of the independent offenders did not commit their crimes for their own sexual gratification; they are trying to satisfy others' needs. They usually made no effort to hide the act. Dr. Davin found no correlation between female sex offenders and paraphilias because the crimes are not committed as a result of sexual desire.

Although she had not examined Angela or administered an MMPI, Dr. Davin was permitted, over continuing objection, to testify to certain characteristics reflected in Angela's records that were consistent with independent offenders she studied. Because she did not use a control group in compiling her data, she could not say whether the characteristics she identified were particular to sex offenders (or, for that matter, whether those characteristics could be used to differentiate offenders from non-offenders).

Dr. Davin was not aware of any research that had specifically addressed the likelihood that female sex offenders would reoffend. She did not know whether any of the women she interviewed had reoffended. She had no idea whether any of the characteristics of women offenders she found in the female sex offenders she interviewed had anything to do with the likelihood of reoffense. She had never done a risk assessment under the SVP statute and had no training in that area. Nevertheless, over a continuing objection, she was permitted by the court to identify various factors that could be used in determining whether or not someone is more or less likely to reoffend. She testified that factors which would make Angela likely to reoffend were the failure to complete MO-SOP, confusion over her identity, lack of remorse or empathy, pursuit of relationships with strangers and minors, lack of regard for authority and lack of regard for others.

The State's next witness was Angela Coffel. She was twenty-four years old at the time of trial. She admitted she pled guilty to two counts of sodomy for acts committed on the eleven and thirteen-year-old boys. Angela said she did not know how to play "Truth or Dare" and the boys asked the questions. Angela said she had begun abusing alcohol when she was

thirteen and had stolen marijuana from her father. She contracted HIV in 1993 from Anthony Johnson when she was involved in his gang. She did not learn very much about HIV until after she was incarcerated.

Angela admitted she signed a paper withdrawing from MOSOP Phase II after she was twenty minutes late for a session and her instructor asked her if she wanted to "start over." She later tried to get back in to MOSOP, but there was not enough time left before her sentence ended, so she did not enter MOSOP again.

Angela testified she is not interested in pursuing relationships if she is released. She plans to pursue a GED and to look after her physical health. Angela admitted to numerous conduct violations while incarcerated. She admitted she had tried to pursue a relationship with a male inmate at Biggs by trying to send him a letter, but now viewed a relationship with him as unrealistic.

Angela admitted that in the past she had had sex because she was a "fat, ugly girl trying to fit in." She has learned not to try to make friends by using sex. She has learned that HIV cannot be transmitted through oral sex, and said she used condoms and oral sex when she had sex with Ahrens and Cantazano. She asked for birth control while she was incarcerated. She could not say she would be celibate upon her release.

The State's final witness was Dr. Amy Phenix, Ph.D., a clinical psychologist from California. Since 1995, she has devoted ninety percent of her time to evaluation of sex offenders. She has performed about one hundred seventy-five SVP evaluations, all of them on male offenders. Angela's evaluation was her only SVP evaluation of a female sex offender. Dr. Phenix has diagnosed and counseled female offenders

for the parole department in California, but not female sex offenders.

In performing evaluations on male sex offenders, Dr. Phenix looks at large group studies to see what the general recidivism rate or base rates are for sexual reoffense for large, diverse groups of male sexual offenders. She then selects the most appropriate actuarial instrument to determine a reasonable ballpark probability of reoffense for a particular person based on their similarity to the sample group in the study. Finally, because the studies do not include all of the risk factors for sexual reoffense, she weighs and balances those other factors she considers important in a particular case and reaches a clinical judgment about it.

Dr. Phenix based her evaluation of Angela on a review of literature identifying characteristics of women who abuse children, a review of Angela's records and a four hour interview of Angela. Dr. Phenix could not say whether the characteristics identified in the studies are risk factors for reoffense because no such research is available at this time. All of the risk factors for reoffense Dr. Phenix considered in evaluating Angela were derived from her clinical judgment because there are no large scale analytical studies identifying risk factors or recidivism rates. Dr. Phenix conceded that one of the problems with making risk assessments based on clinical judgments is that clinicians can overestimate the risk of reoffense. Studies have shown that using clinical judgment as a basis for assessments of the risk of reoffense by male offenders is no better than chance. There is no data or research as to the accuracy of clinical judgment as a means of risk assessment for females.

Dr. Phenix testified that Angela suffers from antisocial personality disorder and borderline personality disorder and that these have been consistent diagnoses docu-

mented in her records. She concluded that these are mental abnormalities that make Angela more likely to reoffend sexually if not confined. In Dr. Phenix's view, Angela has "extreme behavioral impulsivity" and has "absolutely no volitional control over her behavior." Angela uses sex as a means of making friends and can be expected to continue to do so.

The defense presented four witnesses. Kathleen Colebank is the treatment supervisor of the sex offender treatment program at the Kentucky State Reformatory in LaGrange, Kentucky, and supervises sex offender treatment for females at the Kentucky Correctional Institute. She, with Dr. Katherine Peterson, did a study of recidivism among female sex offenders that had been incarcerated and paroled or released in the State of Kentucky since 1982. The study pool consisted of ninety-seven women. The study found that no woman in the study committed a documented sex offense of any type following their release or parole. Two thirds did not reoffend in any manner. Of the ninety-seven women, sixty-seven had no treatment at all.

Dr. Delaney Dean, Ph.D., is a psychologist licensed in Missouri. Dr. Dean worked as an assistant prosecutor for ten years before changing careers. Dr. Dean performed her dissertation research on the assessment of women with borderline personality disorder or dissociative disorder with a history of sexual abuse as children, sometimes perpetrators. She completed her pre-doctoral internship and post-doctoral residency at the Western Missouri Mental Health Center, where she directly encountered sex offenders and their victims and evaluated persons accused of all sorts of crimes, including sex offenders.

Dr. Dean evaluated Angela based on a review of her records, a clinical interview and a Personality Assessment Inventory (PAI) she administered. The PAI is a highly reliable and valuable empirical tool used by forensic examiners because it is supported by solid research. According to Dr. Dean, research has shown it to be an improvement over the MMPI. Dr. Dean uses the PAI in every case in which the person is capable of taking it.

The PAI has four validity indicators which allow a psychologist to determine whether the person taking the test is consistent in his or her responses, understands the task before them, and whether the person provides an accurate picture of herself in a positive or negative direction. These indicators tell the psychologist whether the test results are valid. Angela's validity indicators were solidly in the middle ranges, establishing to Dr. Dean's satisfaction that Angela's test results were valid.

Dr. Dean found certain of Angela's PAI scores to be particularly informative. What we know about recidivism is based on studies of men. Those studies have shown that antisocial personality disorder is very common among male reoffenders, so Dr. Dean evaluated Angela for that disorder as well. In Dr. Dean's view, Angela is clearly not a psychopath, a very severe type of antisocial personality disorder. Moreover, Dr. Dean found that, although Angela shows some features of antisocial personality disorder, she does not fit the full diagnostic category. Dr. Dean explained that the antisocial personality disorder has been broken down by factor analysis into three different factors: egocentricity, stimulus seeking and antisocial behavior. Unless all three factors are present, a person cannot properly be diagnosed with antisocial personality disorder. In evaluations of offenders, Dr. Dean considers antisocial behavior a given. Everybody in prison is antisocial to some degree or they wouldn't be there. According to

Dr. Dean, the other two factors are more important because persons with high ego-centricity and stimulus seeking have personality factors that render them amenable to repeatedly violating the rights of others. This is because they want to have a good time, violate the rights of others and hurt other people. They are the only ones that matter.

Dr. Dean found that Angela scored a full standard deviation below the mean on the egocentricity scale, meaning she is not a self-centered person. Her score on the stimulus seeking scale likewise indicates it is not a core feature of Angela's personality. In other words, Angela's PAI results indicate she is not driven by the types of internal motivators that cause people to consistently violate the rights of others.

Dr. Dean also found Angela's scores on the warmth and dominance scales to be significant. These measures are used to ascertain what a person's interpersonal stance is—i.e., whether they are predatory or seek warmth and closeness with others. Dr. Dean testified that Angela's warmth score was higher than her dominance score, with both scores near the middle of the possible range. Dr. Dean explained that this means that Angela does not see interpersonal relations as an arena in which she wants to get one over on other people and try to get what she can out of that relation. Rather, Angela seeks closeness with others. These findings confirmed Dr. Dean's findings from her clinical interview that Angela is capable of relating in a normal fashion, unlike those with true antisocial personalities.

In Dr. Dean's opinion, the index offenses were essentially adolescent experimentation at a time when Angela was very immature. She is still relatively immature for her age, but Dr. Dean felt she showed a capacity to mature and learn how to handle human relationships in an adult fashion.

Dr. Dean's diagnosis of Angela was substance abuse and other addictions, now in remission, and personality disorder not otherwise specified with borderline and antisocial features. She does not have a mental abnormality as defined in section 632.480(2). She does not meet the full criteria of either borderline personality disorder or antisocial personality disorder. She found no psychopathy or paraphilia or any other disorder that would predispose Angela to sexually reoffend. She is not a pedophile or sexual sadist. Thus, in Dr. Dean's opinion, she does not fit the statutory definition of a sexually violent predator.

Dr. Lynn Maskel, M.D., is a forensic psychiatrist who spends about seventy-five percent of her time evaluating sexually violent offenders. She has evaluated hundreds of women with borderline personality disorder. She evaluated Angela based on a forensic psychiatric interview and a review of her records. She diagnosed Angela with borderline personality disorder but opined that Angela is not a sexually violent predator because her disorder does not predispose her to commit acts of sexual violence. Nor does it prevent her from having the ability to conform.

Dr. Maskel attributed Angela's conduct in committing the index offenses to her emotional immaturity. Her emotional age at the time of the offenses was not far from the victims' chronological ages. Although Angela is still immature, she has improved dramatically and is less likely to be interested in young people. She has no paraphilia or other signs of sexual interest in children.

Dr. Maskel testified that borderline personality disorder can be treated and opined that Angela should be treated for her labile moods. Dr. Maskel did not di-

agnose antisocial personality disorder because it is in the same cluster as borderline personality disorder, which is stronger and clearer in Angela. Her disregard for others and lack of empathy are explained by her emotional neediness and attachment difficulties. Angela's gang activity was not antisocial per se because it was motivated by her need for caretakers.

Dr. Maskel did not perform a risk assessment because she determined that Angela does not have a mental abnormality within the meaning of the statute. Experts know very little about risk assessment for female offenders. There is no literature on female sex offenders and recidivism. Statistics for males cannot be used because they are based on a different population pool. Experts do know anecdotally that the base rate for female sex offender recidivism is extremely low.

Dr. Maskel explained that in order to clinically assess risk, an expert must still start at a known base rate. Dr. Phenix used factors associated with Angela's borderline personality, but there is no research to show that those characteristics make her a higher risk. Experts don't know either clinically or empirically what the risk is. Likewise there is no data to support an assertion that people with antisocial personality disorder are more likely to recidivate.

The final witness was Dr. Richard Scott, who prepared the written evaluation at the court's direction pursuant to section 632.480. He reiterated his diagnoses of borderline personality disorder, antisocial personality disorder, two learning disabilities, and substance abuse. In Angela's case, he did not find antisocial personality disorder to be a mental abnormality within the meaning of the statute because it does not manifest itself in a sexually violent way. There is no pattern of sexually violent or predatory behavior. Although

Angela is impulsive, she does not disregard the consequences of her sexual behavior. She is not disregarding others in performing oral sex because oral sex will not transmit HIV. Angela does not use sex to harm others; she uses it for affection, attention and acceptance. There is no evidence she intended to transmit HIV. She was reckless at times, but used oral sex or protection, so there was no disregard for others in her acts. Although Angela did have a large number of conduct violations while incarcerated, most were minor and occurred early in her incarceration. Kissing another inmate is consensual, and therefore not predatory.

In Angela's case, borderline personality disorder is not a mental abnormality because she does not use sex to harm. Although promiscuity is a problem for her, her behavior is not predatory because she does not use sex to harm. She is not sexually deviant. One characteristic of borderline personality disorder is immaturity, but there is no reason to believe that Angela will have sex with minors because she is older now. At the time of her offenses she would have viewed the victims as peers and would be unlikely to do so now.

Angela's behavior while confined at Biggs reflects her borderline personality disorder. She was lonely and her attempt to communicate with a male inmate there was an attempt to connect with a peer, which was not allowed by the staff. When she is prevented from communicating with others, she gets angry. She tries to have verbal and non-verbal communications with others when she is in the exercise yard. This is against the rules but is not risky behavior. A core element of Angela's disorder is fear of abandonment, and being alone is very difficult for her. Overall, her adjustment has been good.

Although Dr. Scott found no mental abnormality, he addresses risk assessment anyway. Research has shown that clinical judgment is no better than chance in assessing the risk of reoffense by male offenders. Some researchers have found that it is worse. Clinical judgment alone tends to overestimate risk and take into consideration factors that are more emotional than empirical. There is very little data on female sex offenders and recidivism; he found one study where the reoffense rate was one and one-half percent. Experts cannot use literature on men because their motives and patterns of behavior are different. We do know that the reoffense rate for female sex offenders is a very low base rate. To meet the statutory "more likely than not" standard, it would be necessary to identify some variable that would change the expectation of the slight chance of reoffense reflected in the base rate to a probability of reoffense. There are no variables that have been shown to predict reoffending. Theoretically, paraphilia could be such a variable because that is a sexual disorder in which a person acts out against nonconsenting partners or inanimate objects or enjoys the humiliation and pain of others. Angela does not have a paraphilia. Nor does she meet the statutory definition of a sexually violent predator.

At the conclusion of the hearing, the trial court made a finding, beyond a reasonable doubt, that Angela has a mental abnormality which predisposes her to criminal predatory acts of sexual violence, and, if not treated, she will continue to commit sexually violent offenses. She was therefore found to be a sexually violent predator. Angela was ordered committed to the custody of the Director of the Department of Mental Health for care, control and treatment until such time as her mental abnormality has so changed that she is safe to be at large. The trial court

further ordered that Angela be kept in a secure facility, segregated at all times from any other patient under the Director's supervision. This appeal followed.

■ Angela raises four points on appeal. Her third point is dispositive. In that point, Angela urges that the judgment is not based on substantial evidence and is against the overwhelming weight of the evidence, which shows that, although Angela suffers from personality disorders, she does not meet the statutory criteria of a sexually violent predator and that she had only a miniscule chance of reoffending. We find that there is insufficient evidence to support a finding that Angela is more likely than not to reoffend sexually and thus do not reach Angela's remaining contentions.

Only two of the State's witnesses addressed the likelihood that Angela would reoffend. Dr. Davin was allowed, over objection, to identify various factors that could be used in determining whether or not someone is more or less likely to reoffend. Yet Dr. Davin has had no training or experience in assessing the risk of reoffense. She knew of no research that had specifically addressed the likelihood that female sex offenders would reoffend. She did not know whether any of the women she interviewed for her dissertation had reoffended. She had no idea whether any of the characteristics of female sex offenders she identified from her interviews had anything to do with the likelihood of reoffense. Thus, Dr. Davin's testimony about various factors that could be used to determine whether someone is more or less likely to reoffend is rank speculation, not substantial evidence.

The State's other witness on the likelihood that Angela would reoffend sexually was Dr. Phenix. Although characterized by Dr. Phenix as "clinical judgment," it is

clear that her opinion as to the likelihood that Angela will reoffend sexually is not based on any scientific theories generally accepted in the psychological community. Rather, the risk factors Dr. Phenix considered in forming her opinion are derived from her own private, subjective and untested theories, unsupported by any scientific research whatsoever. This is because, to date, no one in the psychological community has ever performed any research to identify what factors lead female sexual offenders to reoffend sexually. The only limited research that has been performed to date has attempted to determine how frequently female sexual offenders reoffend sexually and that limited research indicates it is extremely rare. The only other research on female sexual offenders has been to identify typologies or characteristics of female sex offenders. But there has been no research to determine whether these characteristics are risk factors for reoffense. Dr. Phenix grudgingly acknowledged this on cross-examination:

Q. Now, you've mentioned that when you had done some of the research that you looked at typologies of sex offenders?

A. That's right.

Q. But being able to identify typologies in sex offenders, or characteristics, that's not the same as being able to identify risk factors for reoffense, is that right?

A. Well, in fact, it may be. Some of those characteristics that are present in women who sexually offend may be and may turn out to be, with further research, some of those factors that actually are risk factors

for a particular person to sexually reoffend. We just don't have that data at this point.

Q. But just knowing a type of sexual—a woman's sexual offense, whether it's independent or co-offender, whatever, that doesn't give you any risks for reoffense.

A. You have to determine a risk for reoffense.

Q. Just knowing that label doesn't mean anything in terms of reoffense yet. It may some day but not yet.

A. It may or may not, yes.

Q. And the other risk factors you looked at were clinically derived from your clinical judgment.

A. Actually all of these were derived from my clinical judgment. This is a clinical case, it's a female. We really don't have the data available to look, for example, at an actuarial table or a determined list of risk factors for a large analytical study or something like that. So I use my clinical expertise.

Dr. Phenix's clinical expertise, however, is in the assessment of male sexual offenders. Yet all of the experts testifying in this case agreed that male and female sex offenders offend for different reasons, so the research that has been performed on the factors that cause males to sexually reoffend cannot be applied to female sex offenders. Dr. Phenix has never diagnosed or counseled female sex offenders.[10] She could not have had any formal training in the assessment of female sex offenders because no one has performed any research to support such training. Thus, the factors Dr. Phenix considered in forming

10. Her only prior exposure to a female sexual offender was through her role at the California Department of Mental Health sexually violent predator program. The program had two females referred for evaluation and Dr. Phenix appointed the two doctors who performed the evaluations. It is not clear from her testimony if Dr. Phenix even met the offenders.

her opinion of the likelihood that Angela would reoffend sexually are based on "clinical expertise" that is simply nonexistent. They are simply unproven and untested assumptions that enjoy no widespread acceptance in the psychological community.

Dr. Phenix conceded that research has shown that using clinical judgment as a basis for assessing the risk of reoffense by male offenders is no better than chance. There has been no research on the reliability of clinical judgment in assessing the risk of reoffense by female sex offenders. In the absence of any research, there is no reason to assume it is any more reliable than it is for male offenders. Inasmuch as the use of clinical judgment to assess the risk of reoffense has been shown to be no more reliable than flipping a coin, Dr. Phenix's assessment of the likelihood that Angela will reoffend is not substantial evidence and could not support a finding based on a preponderance of the evidence, let alone beyond a reasonable doubt.

 Had this case been tried to jury, it is clear that Dr. Phenix's opinion as to the likelihood that Angela would reoffend sexually would not be admissible over a proper objection. This is because expert testimony must be based on scientific principles generally accepted in the relevant scientific community. *M.C. v. Yeargin*, 11 S.W.3d 604, 619 (Mo.App.1999). Because Dr. Phenix's testimony revealed that the factors she relied upon were solely a product of her "clinical expertise" and were not based on any scientific research or principles generally accepted in the psychological community, it is not competent expert testimony.

 The trial court was understandably liberal in providing a good deal of leeway to the experts of both parties in an effort to gain as complete an understanding of the state of scientific knowledge as possible. In a court-tried case, we presume that the trial court considers only evidence properly received. *Keen v. Dismuke*, 690 S.W.2d 822, 825 (Mo.App.1985). Likewise, on review of a court-tried case, we consider only the evidence which was properly admitted. *Id.* Because neither Dr. Davin's nor Dr. Phenix's testimony was proper or competent as to the likelihood that Angela will reoffend, we hold that the trial court's determination that Angela is a sexually violent predator is not supported by substantial evidence.

We further find that the judgment is against the weight of the evidence. All of the experts who testified in this case agreed that, based on what little research has been performed to date on the likelihood of reoffense by female sexual offenders, reoffense is extremely rare. From the published studies he was able to find on the subject, Dr. Scott noted a recidivism rate of less than two percent. Absent a finding that Angela has a paraphilia or some other sort of sexual deviancy that would predispose her to prey on children, it is simply not reasonable to assume that Angela is any more likely to reoffend than female offenders are generally. None of the experts found Angela to have a paraphilia or even any strong sexual interest in children. We find no competent evidence to suggest that Angela is more likely than not to reoffend sexually. The trial court's contrary finding is against the weight of the evidence.

For the foregoing reasons, we reverse the judgment and remand with directions to discharge Ms. Coffel from custody.

LAWRENCE E. MOONEY, C.J., MARY K. HOFF, J., Concur.