Deric Lee COON, By and Through His Grandmother and Next Friend, Shirley Coon, Respondent,

v.

AMERICAN COMPRESSED STEEL, INC. and William C. Copeland, Appellants.

No. WD 65185.

Missouri Court of Appeals, Western District.

Nov. 7, 2006.

Motion for Rehearing and/or Transfer to Supreme Court Denied Dec. 19, 2006.

Douglas N. Ghertner, Kansas City, MO, for appellant.

Anita P. Robb, Kansas City, MO, for respondent.

Before HOWARD, C.J., ELLIS and HARDWICK, JJ.

LISA WHITE HARDWICK, Judge.

American Compressed Steel, Inc. (ACS) and William Copeland appeal from a jury verdict finding them liable for the wrongful death of Patricia Walker (Walker). The jury awarded Walker's representatives $2,000,000 in compensatory damages against both defendants and $1,000,000 in damages against ACS for aggravated circumstances. For reasons explained herein, we affirm the judgment.

### FACTUAL AND PROCEDURAL HISTORY

On August 20, 2001, Walker was driving along I–70 in Independence when she was struck and killed by a thirty-seven pound steel plate that flew through her windshield. It was later determined that the steel plate had fallen out of a truck carry-

ing a load of scrap metal. The truck was owned by ACS and driven by its employee, William Copeland. Copeland was charged and pled guilty to the misdemeanor offense of failure to sufficiently secure his transported load, a violation of Section 307.010.[1]

Walker's father, Stephen Walker, filed a wrongful death claim against ACS and Copeland in the Jackson County Circuit Court on November 13, 2001. While that matter was pending, seven-year old Deric Lee Coon (Deric),[2] through his next friend and father, Christopher Coon (Christopher), filed a petition for equitable adoption in the Family Court Division of the Jackson County Circuit Court. The petition alleged that the decedent, Walker, had lived with Christopher and Deric for four years, and that Walker died before she could carry out her plans to marry Christopher and adopt Deric as her son. The petition sought to have Deric posthumously adopted by Walker so he could participate in the wrongful death case.

At a hearing on the petition, Deric presented evidence that his father and three living grandparents had consented to the adoption. Christopher and his parents, Carlton and Shirley Coon, testified Walker had expressed her intent to adopt Deric. Following the evidentiary hearing, the family court entered a judgment declaring Deric as Walker's equitably adopted son. The court also entered a "Verified Order" allowing Deric to bring a wrongful death action relating to Walker's death.

ACS and Copeland filed a motion to intervene in the family court action in order to challenge the adoption judgment. Upon denial of the intervention motion,

ACS and Copeland appealed. This court affirmed the denial, finding the movants had no right to intervene in the family court action because the equitable adoption decree was binding only upon the parties to that action and did not directly affect the potential liability of ACS and Copeland in the wrongful death case. *Coon ex rel. Coon v. Am. Compressed Steel,* 133 S.W.3d 75, 83–84 (Mo.App.2004).

Upon the family court's ruling in the adoption case, Stephen Walker filed a motion to amend the wrongful death petition to add Deric as a party plaintiff. The circuit court granted the motion after receiving the verified order of adoption. The circuit court then appointed Deric's grandmother, Shirley Coon, as his next friend, and an attorney, Molly Korth Williams, as Stephen Walker's next friend because he suffered from mental illness. Stephen Walker subsequently dismissed himself from the wrongful death case, allowing Deric to proceed as the representative plaintiff.

ACS and Copeland filed a motion to dismiss Deric as a party plaintiff, asserting that he failed to show by clear, cogent, and convincing evidence that he was the equitably adopted son of Walker. Following full briefing by both sides, including the submission of deposition testimony,[3] the circuit court ruled that Deric was a proper party plaintiff and allowed the wrongful death claims to proceed to trial.

At trial, the court permitted the parties to present additional evidence on the issue of the equitable adoption. Outside the hearing of the jury, the court heard testi-

---

1. All statutory citations are to the Missouri Revised Statutes 2000, unless otherwise indicated.

2. Deric was born on January 13, 1995. His natural mother, Shannon Rae Coon, died when he was nine months old.

3. The parties submitted deposition testimony from: Deric Coon, Christopher Coon, Shirley Coon, Carleton Coon (Deric's grandfather), and Glenda Casey Reed (Walker's aunt).

mony from Deric and Shirley Coon about the nature of Walker's relationship with Deric. The court also admitted into evidence the transcript from the family court proceeding and the written consents to adoption by Deric's father and three grandparents. All of the parties presented evidence to the jury regarding the wrongful death claims. The court denied the defendants' motions for directed verdict.

After the close of evidence, the jury returned a verdict in favor of Deric and against ACS and Copeland on the wrongful death claims. The jury assessed compensatory damages of $2,000,000 against both defendants, and an additional $1,000,000 in damages against ACS for aggravated circumstances. At Deric's request, the court ultimately allocated 40% of the total damages to Stephen Walker and 60% to Deric.

ACS and Copeland filed a motion for judgment notwithstanding the verdict (JNOV). The circuit court denied the motion and entered judgment on the jury's verdict. ACS and Copeland appeal, contending the court should have granted the motions for directed verdict and JNOV because: (1) Deric failed to present clear, cogent, and convincing evidence that he was Walker's equitably adopted son and, therefore, a proper party in this wrongful death lawsuit; and (2) Deric failed to make a submissible case on the issue of aggravating circumstances.

### STANDARD OF REVIEW

■■■ Upon review of the denial of a motion for directed verdict or JNOV, the primary question is whether the plaintiff made a submissible case. *Mogley v. Fleming,* 11 S.W.3d 740, 747 (Mo.App.1999). "To make a submissible case, substantial evidence is required for every fact essential to liability." *Id.* The issue of whether the evidence is substantial and the infer-

ences drawn are reasonable presents a question of law. *Id.* In deciding this question, we must "view the evidence in the light most favorable to the plaintiff, presume the plaintiff's evidence is true, and give the plaintiff the benefit of all reasonable and favorable inferences to be drawn from the evidence." *Id.*

### EQUITABLE ADOPTION

■■■ Missouri has recognized "equitable adoption" as a judicial remedy to grant a person the rights of an adopted child for purposes of inheritance. *Coon,* 133 S.W.3d at 81. The need for the doctrine arises when a proposed adoptive parent dies without having conducted a formal adoption. *Id.* Generally, the doctrine is invoked to allow the "supposed-to-have been adopted child" to take an intestate share. *Id.* However, it also has been applied to allow the prosecution of a wrongful death claim by the decedent's equitable adoptee. *Holt v. Burlington N. R.R. Co.,* 685 S.W.2d 851 (Mo.App.1984).

■■■ To prove an equitable adoption, the plaintiff must show that a promise to adopt was made, but the adoption had not occurred prior to the promisor's death. *Weidner v. Am. Family Mut. Ins. Co.,* 928 S.W.2d 401, 403 (Mo.App.1996). The existence of the equitable adoption must be shown with evidence so clear, cogent, and convincing as to leave no room for reasonable doubt. *Id.* Further, if the plaintiff relies solely on circumstantial evidence, that evidence must be " 'consistent only with the existence of the equitable adoption and inconsistent with any other reasonable hypothesis leaving nothing to conjecture.' " *Id.* (quoting *Niehaus v. Madden,* 348 Mo. 770, 155 S.W.2d 141, 144 (1941)).

■■■ An equitable adoption differs from a legal adoption in that it is only valid and binding upon the parties involved in

the equitable proceeding. *Coon*, 133 S.W.3d at 81. Thus, the prior order of equitable adoption from the family court case was not binding upon ACS and Copeland, who were not permitted to intervene as parties in that proceeding. In considering whether Deric was a proper party in the wrongful death action against ACS and Copeland, the circuit court was required to make an independent determination on the issue of the equitable adoption.

Consistent with that obligation, the circuit court allowed the parties to present evidence regarding Deric's status during both the pretrial and trial phases of the wrongful death case. In response to the defendant's motion to dismiss, Deric submitted deposition testimony from his father, Christopher Coon, and his grandparents, Shirley and Carlton Coon, regarding their knowledge of Walker's adoption plans. The evidence at trial included a transcript from the family court proceeding, at which the same three witnesses testified that Walker was engaged to Christopher and had made plans to adopt Deric once she was married. Also at trial, Shirley Coon testified (outside the hearing of the jury) that she had more than one conversation with Walker wherein Walker stated her intent to adopt Deric. The circuit court overruled hearsay objections and expressly relied on the testimony of Shirley Coon in determining that Deric had been equitably adopted by Walker.

In their first point on appeal, ACS and Copeland contend the evidence was insufficient to support the finding of equitable adoption. Specifically, they argue that Walker's out-of-court statements, as at-tested to by Shirley Coon, were inadmissible as violations of the hearsay rule and the Deadman's Statute.[4] If the court had excluded or disregarded this improper evidence, Appellants assert Deric would have failed to meet his burden of proving the equitable adoption by clear, cogent, and convincing evidence.

Hearsay evidence is an out-of-court statement offered to prove the truth of the matter asserted. *Rodriguez v. Suzuki Motor Corp.*, 996 S.W.2d 47, 59 (Mo. banc 1999). Under the hearsay rule, an out-of-court statement is only prohibited when its evidentiary value depends on the truth of the statement. *Id.* If the relevance of the statement lies merely in the fact that it was made, no reliance is placed on the truth of the matter asserted and, thus, the statement is not hearsay. *Id.* Moreover, under the state of mind exception to the hearsay rule, a contemporaneous statement relating to a person's existing intent may be admitted to prove the person actually had such intent, if intent is a relevant issue in the case. *Kelly v. St. Luke's Hosp. of Kansas City*, 826 S.W.2d 391, 397 (Mo.App.1992).

Here, the context of Walker's out-of-court statements indicates they were offered for two purposes: (1) to prove her existing intent to adopt Deric at the time she made the statements; and (2) to prove that she would have adopted Deric in the future if she had not been killed in the accident. The evidence was admissible for the purpose of proving Walker's existing intent because it fell within the state of

---

4. Deric asserts the Appellants have waived any hearsay argument on appeal because their Point Relied On addresses only the sufficiency of the evidence on the equitable adoption and does not specifically challenge evidentiary rulings. *See Gaar v. Gaar's Inc.*, 994 S.W.2d 612 (Mo.App.1999). While we agree that the Point Relied On is deficient, we also recognize that, on this court-tried issue, the trial court could only consider evidence that was properly admissible. *In re Coffel*, 117 S.W.3d 116, 129 (Mo.App.2003). Likewise, in reviewing the sufficiency of the evidence, we must necessarily consider whether the evidence was properly admitted. *Id.*

mind exception to the hearsay rule. Although the out-of-court statements were inadmissible to prove whether the adoption would have actually occurred in the future (i.e. the truth of the matter asserted), the mere fact that evidence may be inadmissible for one purpose does not preclude the court from relying on it for a legitimate alternative purpose. *Rodriguez*, 996 S.W.2d at 59. We find no error, as the trial court could properly consider Walker's out-of-court statements as evidence of her present intention to adopt Deric.

Appellants fail to offer any explanation or authority as to how the subject out-of-court statements violate the current version of the "Dead Man Statute," Section 491.010.[5] Although the statute originally prohibited interested witnesses from testifying about transactions with deceased persons, a 1985 amendment completely abandoned that approach. *Estate of Oden v. Oden*, 905 S.W.2d 914, 918 (Mo.App. 1995). The statute now permits an adverse party to testify about dealings with a person who has died or become incompetent. § 491.010.2.

■ The current Dead Man Statute has no purpose of excluding evidence historically admissible under "firmly rooted" exceptions to the hearsay rule. *Id.* (citing *Idaho v. Wright*, 497 U.S. 805, 816, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990)). The purpose of the 1985 amendment "was to permit the receipt of previously inadmissible evidence, and not at all to require the exclusion of evidence otherwise admissible." *Id.* Because Walker's out-of-court statements were admissible under the state of mind exception to the hearsay rule, the Dead Man Statute was not applicable in this proceeding.

Shirley Coon's testimony regarding her conversations with Walker provided direct evidence of Walker's plans to adopt Deric. Her testimony was fully corroborated by similar recollections of her son, Christopher, and her husband, Carlton, both of whom testified in depositions and at the Family Court hearing that Walker had talked about her intentions to marry Christopher and then adopt Deric. The circuit court could reasonably construe Walker's plans as a promise to adopt and a promise that was not carried out solely as a result of Walker's untimely death. Shirley Coon's testimony provided clear, cogent, and convincing evidence of Deric's equitable adoption. Because Deric did not rely exclusively on circumstantial evidence, he was not required to show that the evidence was only consistent with an equitable adoption and inconsistent with any other reasonable hypothesis.

■ There is sufficient evidence in the record to support the court's independent determination of equitable adoption. Accordingly, Deric was a proper plaintiff to prosecute the wrongful death claim on Walker's behalf. The court did not err in denying the motion for directed verdict or JNOV. Point I is denied.

### AGGRAVATING CIRCUMSTANCES

■ In awarding damages for wrongful death, the trier of fact may be allowed

---

**5.** Section 491.010 provides:

1. No person shall be disqualified as a witness in any civil suit or proceeding at law or in equity, by reason of his interest in the event of the same as a party or otherwise, but such interest may be shown for the purpose of affecting his credibility.

2. In any such suit, proceeding or probate matter, where one of the parties to a contract, transaction, occurrence or cause of action, or his agent in such matter, is dead or is shown to be incompetent, and the adverse party or his agent testifies with respect thereto, then any relevant statement or statements made by the deceased party or agent or by the incompetent prior to his incompetency, shall not be excluded as hearsay, . . . .

to consider "mitigating or aggravating circumstances attending the death." § 537.090. Damages for aggravating circumstances are akin to punitive damages. *Elliot v. Kesler,* 799 S.W.2d 97, 103 (Mo. App.1990). Their purpose is to punish the defendant and deter future wrongdoing. *Id.*

■■■ Under a negligence theory, punitive damages are properly submitted upon evidence that the defendant knew or had information from which he, in the exercise of ordinary care, should have known that the alleged negligent conduct created a high degree of probability of injury, and thereby showed complete indifference or conscious disregard for the safety of others. MAI 10.07; *Hoover's Dairy, Inc. v. Mid–Am. Dairymen,* 700 S.W.2d 426, 436 (Mo. banc 1985). To support a claim for punitive damages, the evidence of aggravating circumstances must be "clear and convincing." *Lopez v. Three Rivers Elec. Co-op., Inc.,* 26 S.W.3d 151, 160 (Mo. banc 2000). The clear and convincing standard requires evidence "which instantly tilts the scales in the affirmative when weighed against evidence in opposition; evidence which clearly convinces the fact finder of the truth of the proposition to be proved." *Peters v. Gen. Motors Corp.,* 200 S.W.3d 1, 25 (Mo.App.2006) (quoting *Lewis v. FAG Bearings Corp.,* 5 S.W.3d 579, 582–83 (Mo. App.1999)).

The jury awarded Deric $1,000,000 in damages against ACS for aggravated circumstances. ACS contends the court erred in denying its motions for directed verdict and JNOV because Deric did not make a submissible case on punitive damages. ACS asserts the evidence was insufficient to show that it knew or had reason to know that there was a high degree of probability that its conduct would result in injury to Walker, or that it was completely indifferent to or showed conscious disregard for the safety of others.

■■■ On appeal, the submissibility of a punitive damages claim presents a question of law, which we review *de novo. Id.* at 24. We view the evidence and inferences in a light most favorable to the plaintiff while disregarding all contrary evidence and inferences. *Id.* Viewed consistent with this standard, the record reflects the following evidence in support of Deric's claim for punitive damages.

ACS employed Copeland as the driver of a "roll-up truck" that transported large containers of scrap metal. Typically, Copeland would drive to the site of an ACS customer, where the containers would be rolled onto the open truck bed. ACS drivers were responsible for inspecting the load to determine whether there was improper material, such as hazardous wastes, wood, or refrigerators. Drivers had the discretion to refuse an improper load, request the customer to correct any problems with the load, or haul it away after tarping, strapping, or chaining the load, if needed, to ensure that it was properly secured.

On August 21, 2001, ACS dispatched Copeland to pick-up a container of scrap metal at the Blue Springs Truck Company. Copeland inspected the loaded container and then pulled it onto his truck. He noticed that some of the scrap metal was piled such that it extended out of the container and about three feet above the sides and back gate of the truck bed. Copeland also noticed that other scrap items were scattered around the bottom of the container. He placed a canvas "diaper" near the bottom of the truck's back gate to catch any loose items.

Sometime that afternoon after leaving the Blue Springs Truck Company, Copeland traveled a route along Interstate 70, past the exit for Highway 291. Witnesses testified that they observed a metal plate fly out of the top and over the sides of a

truck, landing on the pavement of Interstate 70 near Highway 291, on that afternoon at approximately 2:00 p.m. One of the witnesses saw the name "American Steel" on the side of the truck. Later that day at approximately 5:45 p.m., other witnesses saw a semi-truck hit the metal plate in the roadway, causing the metal plate to become airborne and crash through the window of Walker's car, resulting in her fatal injuries.

The thirty-seven pound, fourteen inch by sixteen inch metal plate was later traced to the ACS truck driven by Copeland. Copeland was charged and pled guilty to the misdemeanor violation of failing to sufficiently secure his load, Section 307.010. At the wrongful death trial, ACS acknowledged that Walker was fatally injured as a result of the metal plate that fell out of the truck owned and operated by ACS.

Several ACS management employees testified about the company's policy for securing scrap metal loads. All of the witness agreed that ACS had a duty to safely secure the loads because the failure to do so would create a high probability of serious injury or death to persons on the roadways. Transportation manager, Edward McNeil, and assistant safety manager, Craig Bronston, explained that ACS made a conscious business decision to allow its drivers to decide whether and how a particular load should be tarped, strapped, chained, or otherwise secured. The drivers were expected to consider several factors, including the time it would take to tarp the load, the types of scrap metal involved, and whether the truck would be traveling on highways (at higher speeds) or local streetways. Drivers were orally instructed about these considerations because ACS had no written policy regarding the proper security of loads.

One week after the fatal incident involving Walker, ACS changed its policy and required drivers to place a tarp cover over all loads that would be hauled at highway speeds. The policy change was implemented by ACS president, Jeffrey Ross, who had been with the company for twenty-eight years. Ross testified that there had been at least ten incidents of metal objects falling out of ACS trucks prior to the subject incident. The prior incidents resulted in property damage to other vehicles but no personal injuries.

Deric presented expert testimony from Arthur Atkinson, a transportation specialist in commercial motor fleet safety. Atkinson testified that the fatal incident was both foreseeable and preventable, because the metal plate would not have escaped out and over the top of the ACS truck if the load had been properly covered with a tarp. Atkinson explained that Copeland's conduct in failing to cover the load violated the federal motor carriers' safety regulations, as codified in Section 307.010, and industry standards set forth in manuals for the Missouri Commercial Driver's License, the American Trucking Association, the Professional Truck Driver Institute of America, and the National Safety Council. He further opined ACS violated trucking industry standards by failing to have clear written safety policies and by failing to properly train and supervise its drivers on proper load security procedures. Atkinson concluded that ACS had shown a conscious disregard for public safety in failing to comply with federal and state law and industry standards, particularly in light of its experience with prior incidents of property damage and its overriding concern of business profit in allowing drivers to consider how much time it might take to tarp a load.

Deric also presented the testimony of Robert Lampson, a private investigator who conducted surveillance of the ACS facility and its trucks a few weeks prior to trial. Lampson observed that approxi-

mately 62% of the incoming ACS trucks had scrap metal loads that were not tarped, chained, or covered in any manner. Some of the loads were stacked over the top of the containers and hanging over the sides. Lampson reported that he saw forty (out of a total sixty-four) uncovered ACS trucks during the ten-day period of surveillance.

■ The evidence at trial was sufficient to show, by clear and convincing evidence, that ACS should have known that its failure to routinely require drivers to secure loose pieces of scrap metal, by tarping or otherwise covering their loads, created a high probability of injury. Although prior incidents of loose scrap metal had only resulted in property damage to other vehicles, the president and three employees of ACS all testified that the company had a duty to secure loads to avoid inflicting serious injury or death to persons traveling the roadways. Company management was aware of the laws and industry standards requiring that loads be covered or secured, but they nonetheless had a policy of giving drivers discretion in whether to follow the law. The evidence thereby indicated that ACS showed complete indifference or conscious disregard for the safety of others.

■ Factors that typically weigh against the submission of punitive damages include:

> prior similar occurrences known to the defendant have been infrequent; the injurious event was unlikely to have occurred absent negligence on the part of someone other than the defendant; and, the defendant did not knowingly violate a statute, regulation, or clear industry standard designed to prevent the type of injury that occurred.

*Lopez*, 26 S.W.3d at 160. None of those mitigating factors exist here, where there had been at least ten prior incidents of scrap metal falling into the roadway; there

are no negligent parties other than ACS and its employee, Copeland, and ACS knowingly violated regulations and standards specifically designed to prevent the fatal injury that occurred. Accordingly, we find no error in the trial court's submission of the punitive damages claim against ACS. The motions for directed verdict and JNOV were properly denied.

### CONCLUSION

The judgment is affirmed.

ALL CONCUR.